Christopher Shawn HILL, a minor, by and through Ronald D. Hill, his father and next friend, Plaintiff-Appellant,

v.

C. Read BOLES, M. D., and St. Louis Children's Hospital, Defendants-Respondents.

No. 60788.

Supreme Court of Missouri, En Banc.

June 27, 1979.

Robert Lee Smith, Thurman, Nixon, Smith, Howald, Weber & Bowles, Hillsboro, for plaintiff-appellant.

Eugene K. Buckley, Evans & Dixon, St. Louis, for defendant-respondent St. Louis Children's Hospital.

Doris J. Banta, George E. Lee, Barnard & Baer, St. Louis, for defendant-respondent Boles.

PER CURIAM.

This case was transferred by this court after opinion of the Missouri Court of Appeals, Eastern District, upon application of defendants-respondents. The cause has been further briefed and argued here. This court has concluded the court of appeals opinion by Kelly, J., is correct and we therefore adopt the same without use of quotation marks as follows:

Ronald D. Hill, father and next friend of Christopher Shawn Hill, plaintiff-appellant, brings this appeal from the judgment of the Circuit Court of the City of St. Louis in behalf of the defendants, C. Read Boles and the St. Louis Children's Hospital. Because we have determined that the trial court committed errors which were prejudicial to the plaintiff-appellant's rights, we reverse and remand with directions.

Plaintiff-appellant's Amended Petition charged both Dr. C. Read Boles and the St. Louis Children's Hospital with negligence in the medical care and treatment of the minor, Christopher Shawn Hill. More specifically, the defendant-respondents were charged with negligently administering oxygen to the minor while he was a patient in the Hospital under the care of Dr. Boles, causing him to suffer from retrolental fibroplasia, hereinafter called RLF, an eye disease, causing total blindness in the minor's right eye and loss of sight in his left eye so that its vision was limited to simple light perception. Plaintiff-appellant's First Amended Petition alleged that he suffered mental, emotional and physical pain and prayed for $1,000,000.00 in damages.

Plaintiff-appellant's First Amended Petition was filed on July 25, 1974. The cause was instituted on May 14, 1971, and between that date and July 20, 1973, considerable discovery was employed by the parties, and on November 12, 1974, defendant-respondent Hospital filed its motion for summary judgment on the ground that there was no genuine issue as to any material fact pertaining to the defense of charitable immunity alleged in paragraph 10 of its Separate Answer to plaintiff-appellant's Amended Petition. On February 21, 1975, defendant-respondent Hospital's motion for summary judgment was heard and taken under submission and on March 10, 1975, the trial court sustained the Hospital's motion for summary judgment.

The cause against the remaining defendant-respondent, C. Read Boles, came on for trial on March 24, 1975, was tried to a jury, and a verdict for the defendant-respondent Boles was returned on April 3, 1975.

Thereafter, on April 15, 1975, plaintiff-appellant filed his motion to set aside the judgment entered on the jury verdict in

favor of defendant-respondent Boles and to grant him a new trial as to said defendant-respondent Boles and also a separate motion to set aside the judgment entered in favor of the defendant-respondent Hospital on its motion for summary judgment and for a new trial as to said defendant-respondent. On June 30, 1975, both of plaintiff-appellant's motions were overruled and on July 3, 1975, a notice of appeal from both of these judgments was filed to this court.

The evidence at trial was as follows: The plaintiff was born on May 19, 1969 in Washington County Memorial Hospital, Potosi, Missouri, approximately two months prior to the expected delivery date of July 10, 1969, as projected by the delivering physician, Dr. Kirby Turner. Christopher was the second of a set of fraternal twins, the first born having died shortly after delivery. He was examined by Dr. Turner and the hospital record indicates his general condition was good, including vision, but shortly after delivery the baby showed symptoms of respiratory distress, which included cyanosis (a bluish color of the skin) and grunting. Dr. Turner then prescribed oxygen for Christopher, which he received after being placed in a type of incubator called an isolete.

Dr. Turner advised transferring the plaintiff to St. Louis Children's Hospital, and arrangements were made with the defendant, Dr. Boles, a pediatrician on the staff of Children's Hospital, to whom Dr. Turner had referred children with pediatric problems in the past. Approximately two hours and fifteen minutes after birth, Christopher was placed in a portable isolette and transported by station wagon to St. Louis Children's Hospital.

Plaintiff was admitted to the hospital at 7:30 p. m. and was examined by Dr. Robert Greenwood, a first year intern, who noted the child was a premature infant with respiratory distress syndrome. At this point a blood count, a retriculocyte count (a test to determine whether a baby is producing a high amount of red cells because they are being destroyed), a urinalysis, a chest x-ray, a measurement of how much glucose was in the bloodstream, a throat culture and a blood culture were ordered. Dr. Greenwood also prescribed sodium bicarbonate due to a finding of low blood acidity. Throughout this time Christopher was also receiving oxygen at a rate of approximately 50%, a significantly higher percentage than the 20 to 21% normally found in the atmosphere.

Defendant Boles arrived at around 9:30 p. m. and examined the plaintiff, observing the child was in an isolette, receiving fluids through a catheter which had been inserted at Washington County Hospital. He found the child was in respiratory distress, manifested by an increased breathing rate, grunting, increased movement of the abdomen, as well as the chest wall, which was sinking in, a bruise covering the entire head, and moderate cyanosis. The first written order for oxygen was 40 to 50 percent, issued on May 20, 1969, between one and two a. m., and later that morning a second written order prescribing: "less than 40 per cent oxygen unless cyanotic" was put into effect. This order remained in effect until 7:30 a. m. on May 24, 1969.

Dr. Boles returned on May 20, 1969 to examine the child and found he still had respiratory distress. The x-ray taken showed the child had bronchial pneumonia and Dr. Boles stated this was present on May 21, 22 and 23, 1969, and was a condition which warranted the continuation of oxygen. No additional x-rays were taken however. Dr. Boles testified his decision was based on daily examinations of the child during which the isolette was opened to determine how the child reacted to the change in oxygen, a procedure called "challenging." During this period Dr. Greenwood testified that he also regularly examined the plaintiff outside of the isolette and he determined that oxygen was necessary on May 21, 22, and 23, 1969, because the child showed rapid respiration and began to develop signs of respiratory distress when removed from the isolette. The hospital chart reflects no such observations nor does it reflect that the infant was challenged. The oxygen was ordered turned off by Dr. Greenwood on May 24, 1969, by telephone,

after he received a call from a nurse stating she had gotten an elevated oxygen reading.

Throughout the time plaintiff was receiving oxygen, readings were taken by nurses of the oxygen concentration. The concentration on May 21st ranged from a low of 30% to a high of 38%. On May 22nd the only measurement shown was 30%. On May 23rd there were readings of 30% to 34%, and finally May 24th shows readings of 50%, 48% and 44%. These last readings appear to be errors because there is no evidence presented showing oxygen continued after 7:30 a. m., May 24, 1969.

Christopher was discharged from the hospital on June 26, 1969, after reaching a desired weight of 5 pounds. It was determined that plaintiff's parents would take plaintiff to Dr. Turner within a month for an examination. At the time of discharge there was no indication plaintiff suffered from RLF.

On July 25, 1969, Dr. Turner examined Christopher and did not notice anything abnormal about his vision. He reported that, aside from being small, the baby was healthy and normal. He also examined Christopher on October 1, 1969, when his parents brought him in with a sore throat and upper respiratory ailment, and again noticed no abnormalities other than weight. Christopher's parents did not mention any condition concerning his eyes to Dr. Turner.

In mid-October, 1969, the Hills noticed a "rolling, jerking movement" of Christopher's eyes and when they brought Christopher to see Dr. Boles on October 29, 1969, for his six month examination they mentioned the condition to him. Dr. Boles was unsuccessful in his attempt at examining the eyes, and referred the Hills to Dr. Allan Kolker, an ophthalmologist in McMillan Hospital, who saw plaintiff on November 5, 1969. According to Mrs. Hill, Dr. Kolker gave no diagnosis. The affidavit of Dr. Kolker, however, states that Christopher had RLF on November 5, 1969, but it does not say he advised the Hills of this diagnosis.

Dr. Kolker referred Christopher to a second ophthalmologist Dr. Isaac Boniuk whose office was located in Queeny Towers of the Barnes Complex. Dr. Boniuk saw Christopher on November 5, 1969, but Christopher was uncooperative when the doctor attempted to examine his eyes, so plans were made to admit Christopher into Children's Hospital on November 16, 1969, to examine him under general anesthesia.

The examination took place on November 17, 1969, at which time an operation was performed on the left eye. Although the Surgical Discharge Summary, transcribed on December 15, 1969, listed the final diagnosis as "RLF, retinal detachment," signed by the attending physician, defendant Boles, Mr. and Mrs. Hill stated they were not told anything about RLF or the use of oxygen. They were only aware their son was almost totally blind. Christopher was discharged from the hospital on November 27, 1969.

The plaintiff's parents first discovered Christopher suffered from RPF in May, 1970, when an insurance claim form was sent to Dr. Boniuk and it was returned with the words "retrolental fibroplasia" written on the diagnosis. Mrs. Hill looked the words up and learned of the association with excessive oxygen. Upon this discovery, the Hills sought legal assistance.

Plaintiff-appellant contends that he is entitled to a new trial as to defendant-respondent Boles because the trial court erred in overruling his objections to allowing counsel for Boles to argue that an unfavorable inference could be drawn from the failure of the plaintiff-appellant to produce Dr. Boniuk as a witness at trial. Under the peculiar circumstances of this case, we agree.

It was Dr. Isaac Boniuk, an ophthalmologist, who diagnosed plaintiff-appellant's condition as retrolental fibroplasia and who performed surgery upon him in Children's Hospital while the minor was there under the care of Dr. Boles. The argument to which plaintiff-appellant refers was the comment of Dr. Boles' trial counsel in argument as follows:

". . . and we come back to this matter of the burden of proof, which rests on the plaintiff. Who brought you these other medical witnesses? The defendant. The defendant brought in Dr. Turner, who saw this child the very first time, to give you the complete story of what his condition was and what the mother's condition was. Would it occur to you that the plaintiff, with the burden of proof in the case, in this case, wouldn't have brought that evidence to you? Their own treating doctor in that community? Would it occur to you that the plaintiff, in order to sustain its burden of proof as to the causation of retrolental fibroplasia, as to the condition of this child, would not have brought him to let you hear, let you look at, let you listen to the testimony of Dr. Boniuk, the surgeon who took care of this child month-after-month, who performed surgery on his eye? Would it occur to you that when you have the burden of proof—

MR. SMITH: Your Honor—

MR. LEE: —that you would not do that?

MR. SMITH: Please, please, I want to object to this. The record will show that Dr. Boniuk was a professional associate of Dr. Allen Kolker, the ophthalmologist.

MR. LEE: That's not so, Your Honor, and I object to this kind of argument.

MR. SMITH: I am making an objection.

MR. LEE: Well, I object to this as an improper objection. This is their treating doctor and I have a right to comment on it.

THE COURT: Let's proceed.

MR. SMITH: May I make an objection, Your Honor?

THE COURT: You may.

MR. SMITH: My objection is that the record shows very definitely that Dr. Boles referred Christopher to Dr. Kolker and from there to Dr. Boniuk, and then—

MR. LEE: That's not so. The record shows that Dr. Kolker referred him to Dr. Boniuk.

MR. SMITH: Excuse me, Mr. Lee—

MR. LEE: I object to it; this is what he has been doing throughout this lawsuit.

MR. SMITH: I object to that statement.

THE COURT: Gentlemen—

MR. SMITH: I ask that the jury be instructed to disregard what Mr. Lee just said.

THE COURT: The Court is instructing the jury to disregard the last statement by Mr. Lee. I overrule the objection.

MR. SMITH: I haven't made my objection.

THE COURT: I understand your objection.

MR. LEE: He understands your objection and I object to his repeating it as needless.

THE COURT: Well, it is preserved. I have saved your time."

Plaintiff-appellant argues that Dr. Boniuk was not, under the circumstances, peculiarly available to him as a witness but was, rather, equally available to both parties, or more available to Dr. Boles.

▮ The rule in Missouri is that the raising of a negative inference in argument from a party's failure to produce a witness is improper if the witness is equally available to both parties, *Stotler v. Bollinger*, 501 S.W.2d 558, 561[7] (Mo.App.1973); *Lyons v. Taylor*, 333 S.W.2d 346, 356[9] (Mo.App. 1960), and if the trial judge overrules an objection to such argument it is prejudicial error. *Halley v. Schopp*, 400 S.W.2d 123, 126[4] (Mo.1966).

▮ Whether a witness is equally available depends upon several factors. Among these factors are:

1. one party's superior means of knowledge of the existence and identity of the witness;

2. the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case; and

3. the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would

be expected to testify in favor of the one party against the other.

*Chavaries v. National Life & Accident Ins. Co.*, 110 S.W.2d 790, 794[12, 13] (Mo.App. 1937). These standards have been applied in a number of later cases, including *Adam Hat Stores v. Kansas City*, 307 S.W.2d 36, 41[9] (Mo.App.1957) aff'd 316 S.W.2d 594 (Mo. banc 1958); *Hawkins v. Allen Cab Company*, 457 S.W.2d 940, 942[3–5] (Mo. App.1970); and *Gridley v. Johnson*, 476 S.W.2d 475, 479[2] (Mo.1972).

In Missouri the cases have generally held that a party's treating and examining physician in a personal injury action is presumptively more available to that party. *Stotler v. Bollinger*, supra, *Richardson v. Wendel*, 401 S.W.2d 455, 459[10] (Mo.1966). We believe, however, that in a proper case this presumption may be held inapplicable by reason of the circumstances shown in evidence.

■ We have here a malpractice case seeking damages from a treating physician for alleged negligence in the performance of his professional duties toward the plaintiff-appellant. The witness whose absence was the subject of comment was associated with the defendant-respondent Dr. Boles in the Barnes Hospital Group and was on the staff of the defendant-respondent, St. Louis Children's Hospital. When plaintiff-appellant was re-admitted to the Hospital on November 16, 1969, he was under the care of both Dr. Boles and Dr. Boniuk. The evidence shows that Dr. Boniuk was not selected by the parents of plaintiff-appellant independently; rather, they were referred to Dr. Boniuk after they had seen Dr. Kolker, another ophthalmologist in the Barnes complex, to whom they had been referred by Dr. Boles. Another fact, which we believe is significant in resolving this issue, is the listing of Dr. Boniuk by Dr. Boles' counsel in his supplemental answers to interrogatories filed six days prior to trial as a witness who "defendant may call" and who would testify concerning "retrolental fibroplasia and the condition of plaintiff." This assumes added importance in view of the fact that on January 7, 1975,

plaintiff-appellant filed interrogatories directed to both defendant-respondents requesting that they identify each expert witness they expected to call at trial and to state the subject matter of the testimony to be offered by said witness. On January 9, 1975, Dr. Boles filed a similar interrogatory directed to the plaintiff-appellant and on February 5, 1975, the Hospital also filed the same interrogatory directed to plaintiff-appellant. On February 20, 1975, plaintiff-appellant replied to both of these interrogatories and did not include in same the name of Dr. Boniuk as one of the witnesses he intended to call. On March 18, 1975, Dr. Boles filed "Supplemental Answers" to plaintiff-appellant's interrogatories and named Dr. Boniuk as a witness he might call and who would testify as previously stated.

According to the record, Dr. Boniuk did not inform plaintiff-appellant's parents that his blindness was caused by RLF following the November 17, 1969, examination. They first learned of this diagnosis when they saw an insurance claim form signed by Dr. Boniuk that had the words "retrolental fibroplasia" written on it in May, 1970.

In the typical personal injury action the plaintiff's personal physician has no connection whatsoever with the defendant in the case and was chosen by said plaintiff or was referred to said plaintiff by the physician initially selected by said plaintiff, and the interest of the treating or examining physician lies particularly with the patient without any extraneous interests entering the picture. Under the facts presented here, however, we conclude that the evidence is sufficient to show that there existed enough of a relationship between Dr. Boles and Dr. Boniuk "as would reasonably be expected to affect his personal interest in the outcome of the litigation" and plaintiff-appellant's objection should have been sustained.

We also believe that this situation is analogous to those cases holding an employee witness is more available to an employer. *Goodman v. Firmin Desloge Hospital*, 540 S.W.2d 907, 913[10] (Mo.App.1976). Al-

though Dr. Boniuk was not an employee of Dr. Boles nor of the Hospital, he did colloborate with Dr. Boles in rendering medical services to plaintiff-appellant and was closely tied to the defendant-respondent Hospital. Unfavorable testimony relative to either Dr. Boles' treatment of plaintiff-appellant or to another physician associated with the Hospital would have the same adverse consequences which might befall an employee who testified contrary to the interests of his employer. Dr. Boniuk's failure to report to the parents of plaintiff-appellant his diagnosis and to discuss with them its possible causes is indicative of some reticence on his part to fully advise them of the medical problems involved in their son's case.

The court in *Gridley*, supra, recognized that it is not reasonable to say that where a patient makes a malpractice claim, all doctors he or she sees thereafter must, ipso facto, be produced as witnesses or else the defendant can argue the inference is the missing doctors would not have supported the claim if malpractice. 476 S.W.2d l. c. 479.

Considering the totality of the circumstances portrayed in this record we hold that it was prejudicial error to permit counsel for Dr. Boles to argue the failure of the plaintiff-appellant to call Dr. Boniuk as a witness in the cause over the objection of plaintiff-appellant, and requires that the judgment of the trial court be reversed and the cause remanded for a new trial.

Because we have determined that this cause must be retried, we do not reach the other two points raised by plaintiff-appellant. They are directed, in the first instance, to the sustaining of objections of Dr. Boles to rebuttal evidence tendered by plaintiff-appellant and to the overruling of plaintiff-appellant's objection to testimony of Dr. Byrne, one of Dr. Boles' witnesses, relative to certain studies and reports which plaintiff-appellant contends were inadmissible as hearsay. We would not venture a guess that these same evidentiary problems would arise on a retrial.

We now consider plaintiff-appellant's appeal from the judgment entered upon the trial court's sustaining of defendant-respondent St. Louis Children's Hospital's motion for summary judgment on the grounds that the Hospital was the beneficiary of the doctrine of charitable immunity.

Defendant-respondent Hospital has filed a motion to dismiss plaintiff-appellant's appeal as to the Hospital for lack of jurisdiction. The grounds as stated in this motion are the failure of the plaintiff-appellant to file a motion for rehearing or reconsideration within fifteen days after entry of the summary judgment on March 10, 1975, and therefore the judgment became final for the purpose of appeal on April 9, 1975, at the expiration of thirty (30) days after the entry of the summary judgment, and the notice of appeal from that judgment was not filed by the plaintiff-appellant until July 3, 1975.

The right of appeal is purely statutory. Section 512.020 RSMo. 1969 governs who may appeal a case from the trial court and when, and our courts have stated repeatedly that since an appeal must be from a final judgment (with specified exceptions), the trial court must have disposed of all issues and all parties. This requirement that all issues and all parties have been disposed of is for the purpose of avoiding piecemeal presentation of cases on appeal, except where specifically so authorized. *Bolin v. Farmers Alliance Mut. Ins. Co.,* 549 S.W.2d 886, 889[2, 3] (Mo. banc 1977).

The question then is whether the trial court entered a final judgment from which plaintiff-appellant was required to perfect his appeal within 10 days after the Hospital's motion for summary judgment was ruled on, March 10, 1975.

The judgment set forth in the transcript as of March 10, 1975, recites:

"The Court having heard and duly considered the separate motion of defendant St. Louis Children's Hospital for summary judgment heretofore filed, heard and submitted to the Court on February 21, 1975, upon the evidence and proof adduced, and being now sufficiently advised

of and concerning the premises thereof, doth now order that said motion be and the same is hereby sustained.

"It is further ordered by the Court that this cause be and the same is hereby reassigned to Division No. 1 of this Court for further proceedings thereon."

On April 15, 1975, plaintiff-appellant filed a motion to set aside the judgment in favor of the Hospital based upon the sustaining of the Hospital's motion for summary judgment and for an order directing that the plaintiff-appellant be granted a trial on the issues between himself and the Hospital. On June 30, 1975, this motion was overruled and on July 3, 1975, plaintiff-appellant filed his notice of appeal from said judgment.

In *Bolin v. Farmers Alliance Mut. Ins. Co.,* supra, the trial court had rendered a summary judgment in favor of defendant insurer and a few days later sustained, without prejudice, the motion of the named beneficiary in a trip accidental death insurance policy issued on the life of Alma Mae Bolin in a suit brought by the heirs at law and the personal representative of the decedent against the insurance company to collect the proceeds of the policy of insurance. In the suit, the named beneficiary was also a named defendant. The summary judgment for the insurance company was entered on March 21, 1975, and the motion of the named beneficiary Marilyn Abernathy, to dismiss as to her was sustained, without prejudice, on March 25, 1975. On April 21, 1975, plaintiffs filed their notice of appeal from the summary judgment entered on March 21, 1975.

The judgment on the insurance company's motion for summary judgment stated: "This judgment shall not affect the rights of defendant Marilyn Abernathy." The court held, id. l. c. 890, that the entry of summary judgment, although it settled the issue between the plaintiffs and the insurance company as to whether the plaintiffs were entitled to judgment against the insurance company on the policy of insurance, did not undertake to resolve the issues between plaintiffs and Abernathy and specifically recited that it was not to affect her

rights, if any. Under these circumstances, the summary judgment was held to be an interlocutory judgment or order, and not a final judgment from which an appeal would lie.

In *New Age Federal Savings & Loan Ass'n. v. Miller,* 461 S.W.2d 876 (Mo.1970), the Court also held that a motion for summary judgment dismissing the third-party petitioner's claim was not a final judgment from which an appeal would lie, because it did not purport to adjudge the rights of all of the parties and the trial court did not specifically designate it as a final judgment for purposes of appeal, and no order was made for separate trial of issues among the other parties. The court, l. c. 878, said:

"Under the rule it has long been held that a final appealable judgment is one which disposes of all parties and all issues in the case. * * * The only exceptions are where the court has ordered separate trials of issues, or has designated the judgment or order entered final for purposes of appeal."

█ We hold that the summary judgment entered on March 10, 1975, was not a final judgment from which an appeal would lie and deny the motion of defendant-respondent St. Louis Children's Hospital to dismiss plaintiff-appellant's appeal on the grounds his notice of appeal was not timely filed.

The defendant-respondent Hospital contends that the trial court correctly sustained its motion for summary judgment because plaintiff-appellant's cause of action arose prior to November 10, 1969, at a time when the doctrine of charitable immunity was still the law in this State and that there is no genuine issue of fact on this point as evidenced by the pleadings, depositions, admissions on file and affidavits in support thereof.

Stated simply, the issue then is: When did the cause of action arise?

The answer to this query is crucial. If it arose prior to November 11, 1969, the doctrine of charitable immunity was alive and well in this state. However, if it arose

after November 10, 1969, the doctrine had been dealt a lethal blow by the decisions of the Supreme Court of Missouri in *Abernathy v. Sisters of St. Mary's*, 446 S.W.2d 599, 606[1] (Mo. banc 1969) and *Garnier v. St. Andrew Presbyterian Church of St. Louis*, 446 S.W.2d 607, 608[3] (Mo. banc 1969).

Plaintiff's argument revolves around principles of law applicable to problems emanating from the application of the statutes of limitation. We are not here concerned with a limitations question. Rather, we are confronted with a question involving prospectiveness, and we believe the principles of law applicable to the one may not apply at all to the other.

The doctrine of prospective application is predicated on a rationale of reliance upon a legal principle and the effect visited upon the parties who have, quite reasonably, relied on the law as it existed at the time they acted, but now find themselves with the "carpet" suddenly pulled from beneath them by reason of the change in the law. That this was a problem was recognized by the court in *Abernathy* when it stated that retrospective application could result in hardship to the institutions which had relied on the doctrine of charitable immunity and that the ends of justice would best be served by applying the decision prospectively only. Subsequent cases have also followed that line. *Burns v. Owens*, 459 S.W.2d 303, 306[2] (Mo.1970); *Bodard v. Culver-Stockton College*, 471 S.W.2d 253, 254[1] (Mo.1971).

The reasoning behind this approach is stated in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 163 N.E.2d 89, 97–98 (1959):

"We do not suggest that the tort itself was committed in reliance on the substantive law of torts, i. e., the bus driver did not drive negligently in reliance on the doctrine of governmental immunity, but rather that school districts and other municipal corporations have relied upon immunity . . . In reliance on the immunity doctrine, school districts have failed to adequately insure themselves against liability. In reliance on the immunity doctrine they have probably failed to investigate past accidents which they would have investigated had they known they might later be held responsible therefor."

We believe this reasoning is equally applicable to those institutions which formerly enjoyed the cloak of the doctrine of charitable immunity, and the one which should be adopted in this case.

While the Supreme Court in *Abernathy* abolished the doctrine of charitable immunity it did not resolve the question with which we are here confronted, i. e., when did this cause of action "arise?"

Plaintiff-appellant argues that his cause of action arose on one of three occasions: (1) when the damage resulted *and* was reasonably capable of ascertainment; (2) at the time of last treatment of the plaintiff-appellant by the defendant-respondent Hospital; or (3) when the last of a continuing course of acts of negligence on the part of the Hospital in failing to alert plaintiff's parents for signs of possible eye damage so that if any signs were observed they could have been minimized by early treatment.

Plaintiff-appellant's first argument is based upon Section 516.100 RSMo. 1969, the statute of limitation in civil actions, which provides that in civil actions a cause of action does not "accrue" when the wrong is done, but when the damage results and is reasonably capable of ascertainment.

His second argument relies on two malpractice cases in which the Court held that in medical malpractice cases the statute of limitations did not commence running until after the physician ceased treating the plaintiff, and that where the treatment is continuing and of such nature as to charge the physician with the duty of continuing care and treatment essential to recovery, then, until the physician-patient relationship ceases. *Thatcher v. DeTar*, 351 Mo. 603, 173 S.W.2d 760, 763[3] (1943); *National Credit Associates, Inc. v. Tinker*, 401 S.W.2d 954, 959 (Mo.App.1966).

Plaintiff-appellant's third alternative argument on when his cause of action arose is that the Hospital was guilty of a number of negligent acts which continued at least until November 17, 1969. These negligent acts, according to the plaintiff-appellant are: (1) the negligence of the Hospital in not explaining to his parents the risk of eye damage in the administration of oxygen to a premature infant, (2) the negligence of the Hospital in not having him examined by an ophthamalogist in view of the danger involved, (3) the negligence of the Hospital in failing to examine him at regular intervals, and (4) the negligence of the Hospital in failing to advise his parents that he had been overexposed to oxygen. Because of these negligent acts on the part of the Hospital, plaintiff-appellant contends that his eyes progressively deteriorated until November 17, 1969, when the examination and operation under general anesthetic was finally performed and his parents were finally told he had an eye problem.

As we have stated hereinbefore, we do not believe the principles applicable to statute of limitations problems are controlling here. The reasons behind the enactment of statutes of limitation and the rule of prospective application are not the same. The former are statutes of repose enacted for the purpose of preventing the assertion of stale claims, *Thatcher v. DeTar*, supra, 173 S.W.2d l. c. 761(1), whereas, the doctrine of prospectiveness is applicable to those situations where retrospective application of a change in the law by reason of judicial interpretation would impose a hardship on one of the parties to the appeal because of their reliance on the law as it was declared prior to the decision bringing about the change. *Abernathy v. Sisters of St. Mary's*, supra.

■ Viewed in this light, we conclude that the term "arise" as used in *Abernathy*, supra, means the time at which the negligent act complained of took place. We so conclude, although we do not suggest that the tort itself was committed in reliance on the substantive law of torts, i.e., the Hospital did not act negligently in reliance on the

doctrine of charitable immunity. *Molitor v. Kaneland Community Unit District No. 302*, supra.

In so holding we do not however dispose of the question whether the trial court erred in sustaining defendant-respondent Hospital's motion for summary judgment, because we have not as yet determined when the alleged negligent act or acts of the Hospital, if any, occurred.

The Hospital argues that it occurred, if at all, when the oxygen was administered to plaintiff-appellant, i. e., May 19–24, 1969. Plaintiff-appellant contends, on the other hand, that the Hospital had a continuing duty towards him because Dr. Boles continued treating him and he was readmitted to the Hospital on November 16, 1969, and wasn't discharged until November 29, 1969, and yet his parents were not advised of his blindness until November 17, 1969, and were never informed directly by either Dr. Boles nor the Hospital of the cause of his blindness. If the Hospital is correct in its contention, it is clear, in our opinion, that the negligence causing plaintiff-appellant's injuries took place prior to November 10, 1969, the day on which the abrogation of the charitable immunity doctrine became effective. If, on the other hand plaintiff-appellant's contention is correct, and if the Hospital's negligence, if any, extended beyond the effective date of *Abernathy v. Sisters of St. Mary's*, supra, and if it was a proximate or contributing cause to plaintiff-appellant's injuries, we are then of the opinion for reasons hereinafter stated that the trial court erred in sustaining the Hospital's motion for summary judgment and the judgment of the trial court entered thereon should be reversed and the cause remanded to the trial court for further proceedings.

The Court in *Abernathy*, unlike the decisions abrogating the governmental immunity doctrine, did not delay the effective date of the decisions "(i)n order that an orderly transition be made, that adequate financial planning take place, that governmental units (charitable institutions) have time to adjust their practices and that the legisla-

ture be afforded an opportunity to consider the subject in general, . . ." *Jones v. State Highway Commission*, 557 S.W.2d 225, 231(11) (Mo.1977), *Prewitt v. Parkway School District*, 557 S.W.2d 232 (Mo.1977), and *Wheeler v. St. Clair County Hospital District No. 1*, 557 S.W.2d 233 (Mo.1977). In fact, in *Abernathy*, supra, the Court clearly refused to delay the effective date in the change of the law to permit charitable institutions to make an "orderly transition" or to give the legislature an opportunity to consider the subject. 446 S.W.2d l. c. 606(4).

Defendant-respondent argues that the cause of action in this case arose at the time of the breach of duty, i. e., prior to November 10, 1969, when the doctrine was still available to the Hospital and when the oxygen was administered to plaintiff-appellant. In support of this argument, the Hospital refers to the affidavit of Dr. Kolker that plaintiff-appellant had retrolental fibroplasia on November 5, 1969, and prior to thereto; that, therefore, the damage was clearly capable of ascertainment prior to November 10, 1969, and the cause of action "arose" prior to the effective date of the *Abernathy* decision.

We believe that it is abundantly clear that plaintiff-appellant has alleged that the retrolental fibroplasia was the direct result of overoxygenation of the infant while he was in the isolette between May 19, and May 24, 1969. However, we also discern from a reading of the brief of plaintiff in opposition to defendant's motion for summary judgment the plaintiff-appellant contends that by reason of the failure of the Hospital to advise the parents of the symptoms to be observed, the excessive oxygen administered to him while confined in the isolette in the Hospital "had begun an insidious course of visual deterioration known as retrolental fibroplasia which in the months ahead would, as it progressed, cause detachment of the retinas resulting in blindness." And later in the brief filed in the trial court, he argues: "a surgical attempt was made to prevent total detachment of the left retina." In the deposition of Ruth Ann Hill, plaintiff-appellant's mother, she testi-

fied that he was admitted to the Hospital by arrangement of Dr. Kolker so that Dr. Boniuk could examine him under an anesthetic on or about November 16, 1969, during which admission surgery was performed on plaintiff-appellant's left eye for a detached retina. She further testified that no operation was performed upon the right eye because plaintiff-appellant, she learned after the operation, was totally blind in that eye. According to Mrs. Hill the operating surgeon explained to her and her husband, after this surgery, that the operation would be performed to preserve the light perception that he had in the left eye.

Plaintiff-appellant has alleged that the Hospital was negligent in failing to inform his parents of the diagnosis of his eye difficulties which commenced with the initial hospitalization immediately following his birth and the concealment from them of the symptoms to look out for by reason of his exposure to excess oxygen while confined to the isolette. We also gather from his argument that it is his position that this negligence combined with the negligence of the treating physician, Dr. Boles, and the intern in the employ of the Hospital, Dr. Robert Greenwood, was the proximate cause of the loss of the sight in his right eye and the diminished vision in the left eye which, had the parents been warned as to what symptoms to look for, would not have taken place.

We further conclude, from plaintiff-appellant's petition, the portions of the deposition of Mrs. Hill, his mother, and the argument in his brief in the trial court that there is a fact issue which must be resolved, i. e., whether the negligence of the Hospital, if such it was, was a continuing failure to perform a duty owed to the plaintiff-appellant which culminated in the loss of vision in the one yes and diminished vision in the other, a condition which could have been avoided or lessened had his parents been advised of the nature the "invidious" process of deterioration referred to by plaintiff in his brief in the trial court.

If, upon remand, the plaintiff-appellant can adduce evidence to support his contention that the continuing negligence of the Hospital caused or contributed to cause the loss for which he now seeks damages, and that said negligence continued to a date beyond November 10, 1969 when the doctrine of charitable immunity was abrogated, we are of the opinion that his cause of action would be viable and would not have arisen until such time as the treatments for the disease terminated. *Thatcher v. DeTar,* supra.

We reverse the judgment of the trial court entered in behalf of the St. Louis Children's Hospital and remand the cause to the Circuit Court for further proceedings not inconsistent with this opinion.

MORGAN, C. J., and BARDGETT, SEILER and SIMEONE, JJ., concur.

FINCH, Senior Judge, dissents in separate dissenting opinion filed.

DONNELLY and RENDLEN, JJ., dissent and concur in separate dissenting opinion of FINCH, Senior Judge.

WELLIVER, J., not participating because not a member of the court when cause was submitted.

FINCH, Senior Judge, dissenting.

I respectfully dissent from that portion of the principal opinion which reverses the judgment in favor of St. Louis Children's Hospital and remands the case for a new trial on plaintiff's claim against the hospital.

Plaintiff's petition asserts that excessive amounts of oxygen were administered between the dates of May 19 and May 24, 1969, while plaintiff was a patient in Children's Hospital under the care of Dr. Boles. As a result, says plaintiff, he suffered retrolental fibroplasia which caused total blindness in plaintiff's right eye and the loss of all sight in the left eye except for simple light perception. Recovery therefor is sought from both the doctor and the hospital.

Plaintiff was discharged from the hospital on June 26, 1969 and was not back in the hospital until readmitted on November 17, 1969, for examination under anesthesia by Dr. Boniuk. At that time Dr. Boniuk performed an operation on the left eye to prevent total detachment of the retina. Only simple light perception remained at that time in the left eye. No operation was performed on the right eye because plaintiff had no sight in that eye.

During the time plaintiff was in Children's Hospital in May and June of 1969, the doctrine of charitable immunity existed in this state. Under that doctrine hospitals such as Children's Hospital were immune from liability for tort. Hence, even if excessive oxygen was administered by the hospital as alleged, Children's Hospital was not liable therefor. Such charitable immunity continued to exist in 1969 until this court abolished the doctrine in Missouri on November 10, 1969, in the cases of *Abernathy v. Sisters of St. Marys,* 446 S.W.2d 599 (Mo. banc 1969) and *Garnier v. St. Andrew Presbyterian Church of St. Louis,* 446 S.W.2d 607 (Mo. banc 1969). Those cases abolished the doctrine prospectively only. Thereafter, there could be recovery against those previously immune only as to causes of action arising after November 10, 1969.

The principal opinion recognizes that the doctrine was abolished only prospectively and that when *Abernathy* speaks of permitting recovery in causes of action arising after November 10, 1969, it has reference to causes of action wherein the negligent act for which recovery is sought occurred after November 10, 1969. However, having so recognized, the principal opinion then proceeds to hold that the trial court erred in entering summary judgment in favor of the hospital on the theory that recovery against Children's Hospital was barred by the doctrine of charitable immunity. It so holds on the basis of plaintiff's contention that the hospital had a continuing duty to advise plaintiff's parents that as a result of the excessive oxygen administered there " 'had begun an insidious course of visual deterioration known as retrolental fibroplasia which in the months ahead would, as it

progressed, cause detachment of the retinas resulting in blindness.'" Under such theory the hospital had a continuing duty on November 11, 1969, to so advise plaintiff's parents and if the jury finds that it breached that duty and such breach caused or contributed to cause plaintiff's damage, then plaintiff can recover against Children's Hospital.

I cannot concur in such a conclusion. In the first place it imposes a duty on the hospital which is unrealistic and which the hospital should not have. By its holding, the principal opinion thrusts the hospital in the middle of the physician-patient relationship on the theory that the hospital, as well as the doctor, had a duty to examine plaintiff and ascertain his condition and the likely progress of his condition and to advise plaintiff's parents thereof. It cites no case which has imposed such a duty. We should not do so now. People are admitted to hospitals as patients of a doctor. He examines and advises the patient and prescribes the treatment to be administered. The hospital does not diagnose patients' ailments or give them medical advice or prescribe treatment. To do so would constitute the practice of medicine and hospitals are not authorized to do those things.

Absent this theory of a right of recovery based on a continuing duty of the hospital to diagnose and advise plaintiff's parents as to his condition and likely progress and the need for them to act, there is no basis for recovery against the hospital. All of the acts of the hospital of which plaintiff complains occurred while plaintiff was in the hospital in May and June, 1969. The doctrine of charitable immunity, then in effect, prevents recovery therefor.

Even if I could agree that hospitals should have this new duty to diagnose, consult and advise which the principal opinion imposes, I still could not concur in the principal opinion. It seems to hold that if, on remand, there is evidence that the hospital breached this continuing duty to advise plaintiff's parents, and the jury finds that such breach caused or contributed to cause the loss for which recovery is sought, the jury may return a verdict for plaintiff against both the doctor and the hospital for all of plaintiff's loss. The result would be to permit recovery from the hospital for damages incurred during a period of time beginning when oxygen was first administered in May, 1969, when without question the doctrine of charitable immunity made the hospital immune from liability.

Under *Abernathy* the hospital could be liable only for damages resulting from the alleged negligent act of failing on November 11, 1969, to advise plaintiff's parents. Only damages occurring *after* breach of the duty on November 11, 1969, would be recoverable. A theory of a continuing duty to advise cannot result in liability of the hospital for things which occurred and injury which resulted during a time when the hospital was immune from such liability. Clearly, *Abernathy* did not so intend. On the contrary, it clearly was intended to authorize recovery only for damages flowing from things occurring subsequent to November 10, 1969.

It is obvious that all of plaintiff's damage occurred before November 11, 1969. In October plaintiff's parents brought him back to Dr. Boles. He referred plaintiff to Dr. Kolker, an ophthalmologist. He found on November 5, 1969, the plaintiff then had retrolental fibroplasia. Dr. Kolker referred plaintiff to Dr. Boniuk, another ophthalmologist, who attempted unsuccessfully on that date to examine plaintiff. He then scheduled an examination of plaintiff under anesthesia for November 17, 1969. After the examination, Dr. Boniuk operated on plaintiff's left eye. On that date plaintiff was blind in the right eye and had only light perception in the left eye. Thus it is evident that the damage to plaintiff's eyes had already occurred by November 11, 1969.

In support of the decision to reverse and remand the principal opinion cites and relies on *Thatcher v. DeTar,* 351 Mo. 603, 173 S.W.2d 760 (1943). That is a case involving interpretation and application of a statute of limitations. In such a situation liability exists for damages caused by negligence *but for* a statute of limitations which may bar the right of recovery. If the statute of limitations is tolled the pre-existing liability continues to exist. In contrast, where, as

**154**

here, a pre-existing immunity such as charitable immunity is abolished prospectively, there is no pre-existing liability. Therefore, prospective abolition cannot result in continuation of a pre-existing liability. There was none. Hence, principles applicable to statutes of limitations are not controlling.

The principal opinion recognizes at page 150 that such principles are not applicable. However, having done that, it proceeds on page 152 to cite *Thatcher v. DeTar, supra,* as authority supporting remand of the case for determination as to possible recovery from the hospital for the loss for which damages are sought. In so holding the opinion says, "If, upon remand, plaintiff-appellant can adduce evidence to support his contention that the continuing negligence of the Hospital caused or contributed to cause the loss for which he now seeks damages, and that said negligence continued to a date beyond November 10, 1969, when the doctrine of charitable immunity was abrogated, we are of the opinion that his cause of action would be viable and would not have arisen until such time as the treatments for the disease terminated, *Thatcher v. DeTar, supra.*"

I am not certain that I know what that statement means. I think it says that on the authority of *Thatcher* the accrual of the right to sue was postponed until after November 10, 1969, and that in such a situation there can be recovery for all of plaintiff's damages, not just any occurring after charitable immunity was abolished on November 10, 1969.

If my interpretation is correct, the principal opinion is contrary to what this Court held in *Abernathy* about prospective application of the abolition of the doctrine. In cases decided subsequent to *Abernathy* and *Garnier* this Court reiterated its holding with reference to prospective application, refusing to extend the benefit of the abrogation to other cases already pending when the doctrine was abolished. *Bodard v. Culver-Stockton College,* 471 S.W.2d 253 (Mo. 1971); *Burns v. Owens,* 459 S.W.2d 303 (Mo.1970). See also *Swinford v. Bliley,* 513 S.W.2d 381 (Mo.1974); *Varnal v. General Hospital and Medical Center,* 502 S.W.2d 332 (Mo.1973). It would be completely in-

consistent with all of those decisions to now allow this plaintiff to recover for injuries and damages which occurred and accrued prior to November 10, 1969.

If, on the other hand, my interpretation of the language of the opinion is incorrect and it is intended to permit recovery only for any damage shown by the evidence to have resulted after November 10, 1969, as a result of a failure to advise and warn on November 11, 1969 then the language of the opinion should be clarified so as to clearly and explicitly so state. It is possible to state such a ruling so that neither the trial court nor counsel will have any doubt that this is what the Court means. It doesn't make that clear as it is presently written and it is obvious from plaintiff's brief filed in this Court after the opinion of the Court of Appeals had been written that plaintiff does not so interpret the language and that plaintiff will seek on retrial to recover all damages shown to have occurred from and after the time oxygen was administered in May of 1969.

For the reasons hereinabove stated, I would affirm the judgment in favor of Children's Hospital, reversing and remanding for retrial only as against Dr. Boles.