**Pamala EIDE, Respondent,**

v.

**MIDSTATE OIL COMPANY, Appellant.**

**No. WD 48905.**

Missouri Court of Appeals,
Western District.

Jan. 3, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 1995.

Application to Transfer Denied
April 25, 1995.

---

Stephen S. Brown and Terry Karnaze, Kansas City, for appellant.

Ed Dougherty, Kansas City, for respondent.

Before ULRICH, P.J., and KENNEDY and BERREY, JJ.

BERREY, Judge.

Midstate Oil Company (Midstate) appeals from a judgment in favor of Pamala Eide arising from a lawn mower accident that resulted in her left great toe being permanently severed from her body. The accident occurred at a gas station/convenience store in Chillicothe, Missouri, owned by Midstate. The jury returned a verdict of $180,000, allocating 15% of the fault to Mrs. Eide, and 85% of the fault to Midstate. The trial court entered a $153,000 judgment against Midstate, but later amended it to include prejudgment interest, resulting in a judgment of $176,956.03.

Mrs. Eide was hired by the store manager, Della Ishmael, to do the mowing around the store in the spring of 1988 or 1989. She continued the job until the accident on September 5, 1990. The grass was mowed as needed, throughout the growing season, for which Mrs. Eide was paid $25 or $35 per mowing. Mrs. Eide was not an employee of Midstate. Midstate did not furnish equipment to plaintiff, or instruct her on when or how to mow the grass. Mrs. Eide initially mowed the property by herself with a gas powered push mower. After a while, her husband, Gary Eide, and their daughter, Heather Eide, helped with the mowing. Mrs. Eide usually operated the push mower, while Gary ran the weed eater, and Heather used the riding lawn mower.

On the south side of the property, there was a wooden fence that consisted of three sections, each ten to twelve feet long. In April or May of 1990, the south section of the fence came loose from the post. Despite several attempts to reattach the fence to the pole, the fence section fell to the ground. Gary Eide mowed around it two or three times. The store manager, Della Ishmael, decided to move the fence section out of the way, and with the assistance of both Pamala and Gary Eide, they moved the fence section to the southeast corner of the store. The fence section was placed flat on the ground, atop weeds and gravel, next to one of two concrete slabs that supported two air conditioning units. Mrs. Eide testified the fence section was moved a couple of months before the accident.

Mrs. Eide admitted that, in the past, she mowed around the concrete slabs with her push mower. She did not mow around the concrete slabs, from the time the fence section was placed there, until the day of the accident. Gary Eide testified that he trimmed around the fence section with a weed eater, but did not trim the weeds growing between the boards of the fence. Mrs. Eide testified that Gary trimmed around the air conditioning units because of the terrain at the back of the building.

On the day of the accident, Mrs. Eide decided to use the push mower to help her husband trim around the building. Mrs. Eide began to mow around one of the concrete slabs. She held the mower with one hand, and began backing toward the building, pulling the mower towards her. Mrs. Eide fell backwards, and landed on her rear on top of the fence section. She immediately sat up, saw the mower was on her foot, and pushed it off. Mrs. Eide also struck a post as she fell, resulting in a laceration on the inside of her arm. Mrs. Eide's left great toe was amputated as a result of the accident. She had three surgeries on her foot.

Mrs. Eide admitted she "probably did" see the fence section, earlier in the day. Despite

some weeds, a portion of the fence section was visible on the day of the accident.

## I

Point I alleges the trial court erred in failing to direct a verdict in favor of Midstate because Mrs. Eide failed to make a submissible case of negligence. Midstate contends it owed no legal duty to Mrs. Eide as the dangerous condition was known and realized by her. The parties do not dispute that Mrs. Eide was an invitee at the time of the accident.

In determining whether the plaintiff made a submissible case, we will construe the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to plaintiff, and disregard defendant's evidence that does not support the plaintiff's case. *Luthy v. Denny's, Inc.*, 782 S.W.2d 661, 662–663 (Mo.App.1989). The trial court's decision will be reversed only if all of the evidence and reasonable inferences are so strongly against the plaintiff's case that reasonable minds could not differ. *Schnelting v. Coors Distributing Co.*, 729 S.W.2d 212, 214 (Mo.App.1987).

Our Supreme Court has adopted the Restatement (Second) of Torts, § 343 (1965). It provides that a possessor of land is subject to liability for injuries caused by a condition on the land only if the possessor (1) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (2) should expect that the invitee will not discover or realize the danger or will fail to protect themselves against it, and (3) fails to exercise reasonable care to protect them against the danger. *Harris v. Niehaus*, 857 S.W.2d 222, 225–6 (Mo. banc 1993). Under the second element, when the dangerous condition is so open and obvious that the invitee should reasonably be expected to discover it and realize the danger, a possessor of land does not breach the standard of care owed to the invitee "unless the possessor should anticipate the harm despite such knowledge or obviousness." *Id.* [quoting Restatement (Second) of Torts, § 343].

Point I contends Midstate owed no legal duty to Mrs. Eide because the allegedly dangerous condition was known and realized by her. It is not required that a business invitee establish that he lacked knowledge of the allegedly dangerous condition. *Cox v. J.C. Penney Co.*, 741 S.W.2d 28, 30 (Mo. banc 1987). Under our comparative fault system, the jury simply has the responsibility to assess the relative fault of the parties in tort actions. *Id.* Midstate's duty argument fails in this context because it overlooks jury assessment of Midstate's fault for failure to maintain the convenience store in a reasonably safe condition. *Id.* An invitee's knowledge of an obvious danger is considered in determining the invitee's comparative negligence rather than in determining the duty of the owner. *Luthy*, 782 S.W.2d at 664.

The issue in the present case is whether the condition was so open and obvious that Midstate was without a duty to Mrs. Eide. Mrs. Eide testified that the part of the fence she tripped over did not appear to be visible in the photographs of the accident scene. Della Ishmael testified that only "part of the fence section was visible." Gary Eide testified that "there was a lot of that fence not visible." Heather Eide testified that the weeds and grass in the area of the fence were "pretty high."

The evidence in this case created an issue for the jury to decide and precluded a directed verdict. Construing the evidence in the light most favorable to Mrs. Eide, we must find that there was sufficient evidence to support a conclusion that Mrs. Eide did not know of the dangerous condition on the day of the accident or that the end of the fence covered with grass and weeds was not so open and obvious that Mrs. Eide is deemed to have had constructive knowledge of the dangerous condition. *Luthy*, 782 S.W.2d at 662–3.

Point I is denied.

## II

Point II alleges the trial court erred in refusing to give Midstate's assumption of risk instruction. Midstate contends that because Mrs. Eide (1) helped move the fence

section to the location where she fell; (2) understood the necessity of being careful while using a law mower; (3) understood the risks of encountering objects in the grass while mowing; (4) voluntarily undertook the mowing; and (5) acted unreasonably in pulling the mower backward in the vicinity of the downed fence section, the trial court should have submitted the assumption of risk instruction.

■ Assumption of risk bars recovery when the plaintiff voluntarily consented to accept danger of known and appreciated risk, and that she comprehended actual danger and intelligently acquiesced in it. *Ross v. Clouser*, 637 S.W.2d 11, 14 (Mo. banc 1982). "To be charged with assumption of risk, one must not only know the facts which create the danger but must comprehend and appreciate the danger itself. And one's knowledge of a general condition from which the danger arose *does not necessarily constitute knowledge and appreciation of the danger of injury*." (citations omitted) (emphasis in original) *Bullock v. Benjamin Moore & Co.*, 392 S.W.2d 10, 14 (Mo.App.1965). In order to give an assumption of the risk instruction, there must be facts from which a jury can find that the plaintiff intelligently consented to assume the risk and knew the extent of the danger. *Strang v. Deere & Co.*, 796 S.W.2d 908, 916 (Mo.App.1990).

Mrs. Eide helped move the fence to the location where the accident later occurred and was told "the maintenance people [would] take care of it." At the time of the accident, part of the fence section was visible, but there was evidence that the portion of the fence over which Mrs. Eide tripped was covered by grass and weeds. The fact that she helped move the fence several months before the accident does not demonstrate knowledge that the fence remained there on the day of the accident. There was no evidence that Mrs. Eide was aware of the danger of tripping over the fence section, especially when the portion she tripped over was covered by grass and weeds.

Midstate contends that Mrs. Eide acted unreasonably in walking backwards while mowing. The jury assigned 15% of the fault to Mrs. Eide, and 85% of the fault to Mid-

state. Whether Mrs. Eide acted unreasonably in pulling a mower backwards is an issue for the jury when determining the comparative fault of each party. In the case at bar, the fact that Mrs. Eide was mowing backwards is not sufficient to support a finding that she made an intelligent acquiescence in a known danger.

Point II is denied.

## III

■ Point III asserts that the trial court erred in allowing Mrs. Eide's counsel to argue, over objection, adverse inferences from Midstate's failure to call Pam Cafourek and Paul Thurman because they had no knowledge of the facts or circumstances vital to the case, and were equally available to both parties. Before trial, Mrs. Eide's counsel took the depositions of Pam Cafourek and Paul Thurman.

Ed Dougherty, Mrs. Eide's counsel, gave the following closing argument:

Mr. Dougherty: Maybe Mr. Thurman is an employee. I assume he is. He has been sitting here the whole trial, and he hasn't said a thing. He's the operations manager—

Mr. Battis: I object to that too. He has been here if Mr. Dougherty wanted to call him.

The objection was overruled and Mr. Dougherty's closing argument continued.

Mr. Dougherty: The guy who's in charge of it all hasn't stood up here and told you anything. They don't want to tell you anything because they don't have to prove anything. And it's dumped on Della Ishmael. That's their whole case. They're going to dump on Della Ishmael. They canned her because she had some improper audits or something like that. Do you remember the other reason they canned her, folks? She didn't maintain the premises. This place that Kenny Miller said is run perfectly, she didn't maintain the premises.

And Paul Thurman hasn't got up here to tell you anything else, has he? It's easy to

be quiet. It's easy to be silent, just sit over there and say nothing, hoping.

\*   \*   \*   \*   \*   \*

■ Determining the prejudicial effect of closing arguments is a matter within the discretion of the trial court and will not be disturbed on appeal unless there was an abuse of discretion. *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852, 870 (Mo. banc 1993). In closing argument, the parties are given wide latitude to suggest inferences from the evidence, even if the inferences may seem illogical or even erroneous. *Id.*

Our Supreme Court has stated the following about closing argument:

Failure of a party to call a witness who has knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to offer the testimony. To allow reference in closing argument to a party's failure to produce a witness is reversible error if the witness is equally available to both parties. Similarly, it is prejudicial error for the trial court not to sustain an objection to an improper argument. *Kelly by Kelly v. Jackson,* 798 S.W.2d 699 (Mo. banc 1990) citing *Leehy v. Supreme Exp. & Transfer Co.,* 646 S.W.2d 786, 790 (Mo. banc 1983).

■ In *Hill v. Boles,* 583 S.W.2d 141, 145 (Mo. banc 1979), our Supreme Court set out a balancing test to determine if a witness is equally available. The factors to be considered are:

1. one party's superior means of knowledge of the existence and identity of the witness;

2. the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case; and

3. the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party against the other. *Id.*

At the time of the accident, Mr. Thurman was manager of operations for Midstate and was responsible for maintenance of the company stores. Mr. Thurman's position with the company could be used to establish a likelihood that he would testify in favor of Midstate. Mr. Thurman testified in his deposition that he personally visited the Chillicothe store during the weeks prior to the accident, but he did not recall whether he checked around behind the store. He also testified that he had not received any complaints regarding the downed fence section. Mrs. Eide's theory was that Midstate did not adequately and timely report maintenance problems. Mr. Thurman's failure to discover the downed fence section could have been beneficial to the theory that Midstate negligently maintained the Chillicothe store. Mr. Thurman had knowledge material to the issues of the case. We are not convinced that the closing argument made by Mr. Dougherty was an attempt to raise an adverse or negative inference. *Callahan,* 863 S.W.2d at 870. The comments were not prejudicial. *Id.*

■ Midstate's counsel made a proper objection to the remarks in closing argument about Pam Cafourek. The court's response to the objection was, "[t]he jury will remember the evidence as it was presented." There was no ruling on the objection. It is the responsibility of the objecting party to insure that the trial judge has heard and ruled on an objection. *Welch v. Welch,* 633 S.W.2d 447, 449 (Mo.App.1982). If this is not done, nothing is preserved for review. *Hicks v. Smith,* 696 S.W.2d 855, 857 (Mo.App.1985).

The trial court did not err in denying Midstate's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. Point III is denied.

### IV

■ Point IV alleges the trial court erred in denying Midstate's motion to dismiss or transfer, or in the alternative, for change of venue, and in submitting the case to a Jackson County jury. Midstate contends that venue was improperly based on the pretensive joinder of M.F.A. Oil Company (M.F.A.). Midstate alleges there was no basis that

M.F.A. was the owner of the premises, and therefore there was no justiciable claim against M.F.A.

Mrs. Eide's accident occurred at Midstate's store in Chillicothe, Missouri. Her initial lawsuit was filed against M.F.A., Midstate, and Kerr–McGee Refining Corporation in Jackson County, Missouri. Midstate is a Missouri corporation with its principal place of business in Boone County, Missouri. M.F.A. is a Missouri corporation doing business in Jackson County, Missouri. M.F.A. is the parent company of Midstate, but M.F.A. has never had an ownership interest in the store. When the lawsuit was filed, M.F.A. was the only party who "resided" in Jackson County, Missouri. After discovery was started, Kerr–McGee and M.F.A. were dismissed from the suit.

▬▬▬ Venue is a designation of the location or geographical situs where the court has jurisdiction to act in a particular lawsuit. *State ex rel. Rothermich v. Gallagher,* 816 S.W.2d 194, 196–7 (Mo. banc 1991). Venue is determined solely by statute. *Id.* When the trial court finds venue to be improper, the case must be transferred to a circuit where venue is proper. *Id.* The general venue statute, § 508.010 states which venue is appropriate, and provides in part:

> Suits instituted by summons shall, except as otherwise provided by law, be brought:
>
> \* \* \* \* \* \*
>
> (2) When there are several defendants, and they reside in different counties, the suit may be brought in any such county.
>
> \* \* \* \* \* \*
>
> (6) In all tort actions, the suit may be brought in the county where the cause of action accrued regardless of the residence of the parties.

▬▬▬ If venue was properly vested in the first instance, the subsequent dismissal of the resident defendant does not divest the court, in which the action was filed, of venue and jurisdiction over the remaining non-resident defendants. *Bottger v. Cheek,* 815 S.W.2d 76, 79 (Mo.App.1991). "All that is necessary is that under the law and the evidence it appear that plaintiff is entitled to

an honest belief a justiciable claim exists against the resident defendant." *Id.* The party moving for dismissal on basis of fraudulent joinder has the burden of proof. *Id.* at 80.

Early in the case, the store manager, Della Ishmael, gave a statement to Mrs. Eide's counsel stating:

> [t]he store was operated under the name of Kerr–McGee, which I understand is a division of MFA Oil, however, my paychecks came from Mid–State Oil.
>
> \* \* \* \* \* \*
>
> when I saw mainten[an]ce work that needed to be p[er]formed, I called MFA Oil in Columbia and reported this to them. MFA Oil would then send mainten[an]ce people from Columbia to perform the mainten[an]ce work.

Based upon Della Ishmael's statement, it appears that plaintiff had an honest belief that M.F.A. was responsible for maintenance at the store and that a justiciable claim existed against M.F.A.

Point IV is denied.

## V

▬▬▬ Point V alleges the trial court abused its discretion in admitting, over objection, five "gruesome and inflammatory" photographs (exhibits 4, 5, 6, 22, and 23) depicting Mrs. Eide's left foot, after the amputation of her great toe, and for allowing Mrs. Eide to show the jury her left foot. Exhibits 4, 5, and 6 are close-up pictures of Mrs. Eide's swollen foot after surgery. Exhibit 22 shows Mrs. Eide in a wheelchair at home, and exhibit 23 depicts her at home in bed with her foot propped on a pillow. Midstate contends such evidence was cumulative, and that its prejudicial effect outweighed its probative value.

▬▬▬ The admission of a photograph lies within the sound discretion of the trial judge and will not be disturbed on appeal unless an abuse of discretion is shown. *Missouri Highway & Transportation Comm'n v. Rockhill Development,* 865 S.W.2d 765, 770 (Mo.App.1993).

In *Higley v. Missouri Pacific Railroad Co.*, 685 S.W.2d 572, 575 (Mo.App.1985), the trial court admitted into evidence a picture of the plaintiff's mangled arm taken by the surgeon prior to amputation. The picture was a 3″ X 3″ color photograph and was described by the Eastern District as "admittedly gory." The court held that the photo was relevant to the nature and extent of plaintiff's injury and to the damage element of pain and suffering sustained by plaintiff. *Id.* Unlike *Higley*, none of the photos, in the present case, depict Mrs. Eide's left foot or great toe prior to her surgery.

The photographs in the case at bar aided the court and the jury in understanding the nature and extent of Mrs. Eide's injury. In fact, two of the photographs were used in the treating physician's video deposition testimony to describe the injury and remedial measures taken. The photographs cannot be described as "admittedly gory." The trial court did not abuse its discretion in allowing their admission.

Point V is denied.

The judgment is affirmed.

All concur.