Carl D. KAMPE, Appellant–Respondent,

v.

George A. COLOM, M.D., Respondent–Cross–Appellant. (Two Cases.)

Nos. WD 47611, WD 47629.

Missouri Court of Appeals,
Western District.

July 26, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 29, 1995.

Application to Transfer Denied
Oct. 24, 1995.

G. Spencer Miller, Larry K. Marske, Miller, Dougherty & Modin, Thomas W. Koelling, Kansas City, for appellant Kampe.

Michael A. Childs, Larry D. Fields, Brown & James, James R. Wyrsch, Kansas City, for respondent George A. Colom, M.D.

Before ULRICH, P.J., and LOWENSTEIN and HANNA, JJ.

ULRICH, Judge.

Carl D. Kampe was awarded actual and punitive damages against George A. Colom, M.D. in this medical negligence case. The jury awarded Mr. Kampe compensatory damages in the sum of $822,900 and assessed Mr. Kampe's fault at 58%. The jury assessed $818,841 in punitive damages against Dr. Colom. The jury returned a defendant's verdict on Mr. Kampe's separate claim for battery. The trial court denied Dr. Colom's motion for new trial on the compensatory damage claim and for remittitur of punitive damages. The trial court also denied Mr. Kampe's motion for a new trial on his claim of battery. The trial court sustained Dr. Colom's motion for new trial on the punitive damages issue.

Dr. Colom appeals from the court's judgment on the verdict awarding Mr. Kampe $345,618 compensatory damages. Mr. Kampe cross-appeals from the court's order granting Dr. Colom's motion for new trial on the punitive damages issue and from the

judgment entered on defendant's verdict on Mr. Kampe's claim for battery (count II).

The judgment is affirmed in part and reversed in part and remanded for a new trial.

George Colom is a licensed medical doctor who has practiced psychiatry in the Kansas City metropolitan area since 1955. Dr. Colom is a fellow of the American Psychiatric Association and a member of the Society for Psychiatrists in Alcohol and Addiction. In addition to his private practice, Dr. Colom was an independent medical officer for General Motors in Kansas City in 1973 when Mr. Kampe was referred to him for evaluation.

Carl Kampe's employment history is troubled. He began working for General Motors (GM) in 1968 as an assembly line worker when he was nineteen years old. During the first five years of employment, he received numerous verbal reprimands and sixteen written disciplinary actions. He worked for GM for almost twenty years before agreeing to a "General Motors buy out" in 1988.

Mr. Kampe was hospitalized in 1968 for treatment for extreme nervousness and difficulty sleeping. He was on sick leave from his job with GM in 1971, and he was treated for anxiety reaction before seeing Dr. Colom in 1973. Mr. Kampe had worked for General Motors for five years when he was referred to Dr. Colom in 1973.

Mr. Kampe has used contraband drugs. In late 1972 or early 1973, Mr. Kampe smoked a marijuana cigarette in the parking lot of the GM plant that may have contained LSD or some other hallucinogen. He began to hallucinate when he returned to the assembly line, and his supervisor sent him home. He was placed on extensive sick leave and ultimately informed by a General Motors representative that he must be examined by an independent medical evaluator to remain on sick leave. Mr. Kampe was referred to Dr. Colom.

Mr. Kampe was interviewed by an employee at Menorah Hospital, Kansas City, in anticipation of being seen by Dr. Colom. Mr. Kampe described himself as being "nervous and shaky ever since he can remember." He reported that he did not like his job and frequently missed work.

Dr. Colom first encountered Mr. Kampe in April 1973 when he examined Mr. Kampe. Dr. Colom immediately prescribed Valium for Mr. Kampe and continued to prescribe Valium for him for seventeen years until Mr. Kampe was no longer Dr. Colom's patient. During the first five years of treatment with Dr. Colom, Mr. Kampe was prescribed, in addition to Valium, Quaaludes, Desoxyn, Percodan, Didrex, Placidyl, Haldol, Fastin, and Adeipex–P. Between 1978 and 1990, Dr. Colom prescribed forty-eight different medications for Mr. Kampe. Twenty-two of the prescribed forty-eight medications were controlled substances and included tranquilizers, narcotic pain killers, and amphetamines. These medications were prescribed, at least in part, because Mr. Kampe experienced difficulty resolving stress caused by his job and marital problems. Mr. Kampe's condition has been diagnosed by Dr. Colom and at least four other physicians as "borderline personality disorder."

In 1989, Mr. Kampe applied for Social Security disability benefits. Dr. Colom was reluctant to support the contention that Mr. Kampe was disabled and entitled to Social Security benefits. This, at least partly, resulted in termination of their relationship. Mr. Kampe's last office visit with Dr. Colom was in February 1990.

Mr. Kampe began to see Dr. Ewa Gosek, a practicing psychiatrist, in July 1991. Dr. Gosek continued to prescribe Haldol, one of the medications prescribed by Dr. Colom. Dr. Gosek testified that when she first met Mr. Kampe in early 1990, she believed him to be paranoid, especially of physicians. He was mistrustful of medications, and she believed him to be psychotic. It is her opinion that since Mr. Kampe ceased ingesting Placidyl, Desoxyn, and Valium, his ability to reason has improved, although he still manifests a pattern of illogical thinking. She, too, believes Mr. Kampe is unable to resolve stress inherent in employment and that he will require psychiatric treatment for the remainder of his life.

Dr. William Logan, a Board certified psychiatrist, testified as an expert witness. He consulted with Mr. Kampe on four occasions.

He reviewed available records pertaining to Mr. Kampe's hospitalizations and his treatment by Dr. Colom. He opined that Dr. Colom inappropriately prescribed more Valium and Talwin for Mr. Kampe than was necessary. Additionally, he testified that Desoxyn, an amphetamine, was an inappropriate and harmful prescription for Mr. Kampe. Dr. Logan testified that patients experiencing hallucinations such as Mr. Kampe should not be prescribed amphetamines because they can induce hallucinations or aggravate them. He noted that medical records reflect Mr. Kampe's excessive drinking, and Dr. Logan testified that Desoxyn and other stimulants have a high frequency for abuse in individuals who abuse alcohol. He testified that patients experiencing depression, as Mr. Kampe was experiencing when he was Dr. Colom's patient, should not be prescribed Desoxyn and other amphetamines because when such prescriptions cease, patients tend to experience more severe depression.

Dr. Logan also testified that Dr. Colom should not have prescribed for Mr. Kampe anxiolytic drugs, which include Valium, Diazepam and Xanax, for lengthy periods of time. While appropriate for short terms, because of Mr. Kampe's chronic problems, long term ingestion of these drugs creates potential for their habitual use.

Dr. Logan testified that Dr. Colom's practice of prescribing medications to treat Mr. Kampe failed to meet the standard of care required of practicing physicians because Mr. Kampe was administered amphetamines which produced a sleepless condition and necessitated his being treated with depressants to permit him to sleep. Additionally, Dr. Logan testified that administering Desoxyn, Placidyl, Valium, Diazepam, and Xanax to a patient who abused alcohol was inappropriate and breached the standard of care required of physicians.

Dr. Logan testified that Mr. Kampe suffered harm as a result of inappropriate and substandard drug therapy. The medication prescribed for Mr. Kampe by Dr. Colom aggravated his abnormal psychiatric condition by preventing his functioning at an optimal level, contributing to difficulties in his relationship with his family, and keeping him in a persistent state of mental illness. Dr. Logan stated that, within a reasonable degree of medical certainty, the drug therapy prescribed by Dr. Colom substantially contributed to the psychiatric condition experienced by Mr. Kampe when the trial occurred.

Dr. Fred Fayne, a practicing psychiatrist, also testified. He, too, treats patients referred to him by General Motors. Dr. Fayne examined Mr. Kampe. He diagnosed Mr. Kampe as experiencing major depression with psychotic elements and manifesting borderline unstable personality disorder. Dr. Fayne testified that Dr. Colom's treatment of Mr. Kampe had been proper.

Dr. Lee Evans, Professor of both Pharmacy and Psychiatry at the University of Missouri, Kansas City, testified. He possesses a Doctor of Pharmacy degree. His responsibilities include teaching psychopharmacology to resident physicians. His review of medical records pertaining to Mr. Kampe suggested to him that clinical depression was induced because of Mr. Kampe's prolonged use of amphetamines while under Dr. Colom's care. He believed that Mr. Kampe's multiple use of Benzodiazepines simultaneously as directed by Dr. Colom was inappropriate. Thus, he believed that Dr. Colom's prescribed Diazepam and Xanax treatment concurrently with amphetamines was inappropriate. He testified that prescribing sleeping medication for Mr. Kampe as did Dr. Colom breached the standard of care incumbent upon the treating psychiatrist. He testified that consumption of medications prescribed to Mr. Kampe for the duration prescribed and in the quantities and doses prescribed would have affected Mr. Kampe's thought patterns. The prescription of Desoxyn was inappropriate, he said, and Mr. Kampe's permanent psychiatric condition, diagnosed by Dr. Gosek, was substantially contributed to by Mr. Kampe's long term ingestion of medications prescribed by Dr. Colom.

Dr. Kermit Fendler, Doctor of Pharmacy, testified as an expert pharmacologist. He testified that the medications prescribed to Mr. Kampe by Dr. Colom were within the recommended dosage range and that current

literature indicates the absence of long term complications, both physical and emotional, for the use of the drugs prescribed by Dr. Colom. He also testified, however, that amphetamines can induce psychosis and that long term ingestion of amphetamines can affect cognitive thinking, personal relationships, and job performance. He stated that benzodiazepines interact with amphetamines and extended use of benzodiazepines can cause physical dependence and can contribute to psychotic symptoms. He was aware that Mr. Kampe had been diagnosed as manifesting psychoses while treated by Dr. Colom.

### Dr. Colom's Appeal

#### I.

Dr. Colom raises fourteen points in his appeal from the judgment against him for medical negligence. Mr. Kampe raises two points in his cross-appeal. Point six of Dr. Colom's appeal and point two of Mr. Kampe's cross-appeal are dispositive. Dr. Colom's first point regarding a verdict directing instruction is considered because it will directly affect the new trial.

■ Dr. Colom claims that the trial court erred in overruling his objection to Mr. Kampe arguing to the jury a negative inference based on his failure to call Dr. John Wisner as an expert witness. He argues that Dr. Wisner was no longer his expert witness and that he was mutually available to both parties. He claims as support for his argument that Mr. Kampe was informed prior to trial that Dr. Wisner was no longer his expert witness and that Dr. Wisner could have been subpoenaed by Mr. Kampe or his deposition could have been read at trial.

Dr. Wisner is a psychiatrist who had been identified by Dr. Colom as his expert witness. Dr. Wisner examined Mr. Kampe in anticipation of trial. Dr. Wisner prepared and submitted a written report of his examination and his professional opinion regarding Mr. Kampe. Dr. Wisner was deposed by Mr. Kampe's counsel on June 10, 1992. During his deposition, Dr. Wisner was critical of

certain medical treatment administered by Dr. Colom to Mr. Kampe. However, Dr. Wisner concluded that Mr. Kampe was not significantly harmed by the questionable medical treatment.

Dr. Colom's counsel informed Mr. Kampe's counsel in August 1992 that he wanted additional psychiatric examination of Mr. Kampe. Mr. Kampe objected and Dr. Colom filed a motion to compel the examination by Dr. Fred Fayne. Dr. Colom asserted that Dr. Wisner's examination had not included evaluation of Mr. Kampe's ability to become employed and to earn an income, and Dr. Fayne's examination of Mr. Kampe would include such evaluation. The court held two evidentiary hearings and ultimately permitted Mr. Kampe's examination a second time for the limited purpose of permitting Dr. Fayne to determine the plaintiff's ability to work. Dr. Fayne examined Mr. Kampe, prepared his medical report, and testified at trial.[1]

Before closing argument, Mr. Kampe's counsel informed the court of his intention to argue the adverse inference of Dr. Colom's failure to call Dr. Wisner, his previously retained expert. The trial court permitted the argument. The applicable argument was as follows:

> The second defense is this. Not including those, we need a doctor to help us. We're going to consult with Dr. Wisner. You've heard Dr. Wisner's name. Dr. Wisner never came in and testified. Dr. Wisner saw Carl Kampe. Carl said he saw him over at a church. Right after they had Carl examined by Dr. Wisner, they decided to use Dr. Fayne. Why didn't they call Dr. Wisner? Because Dr. Wisner would not help them in this case.

■ Failure of a party to call a witness who has knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to offer it. *Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 701 (Mo. banc 1990) (citing *Leehy v. Supreme*

---

1. Dr. Colom's counsel caused a letter to be delivered to Mr. Kampe's counsel in which he stated the Dr. Wisner would not be Dr. Colom's expert witness and that Dr. Fred Fayne would testify as his expert witness instead.

*Express & Transfer Co.*, 646 S.W.2d 786, 790 (Mo. banc 1983)). To allow argument of a negative inference resulting from a party's failure to produce a witness is reversible error, however, if the witness is equally available to both parties. *Id.* The trial court's failure to sustain an objection to such an improper argument, therefore, constitutes prejudicial error. *Id.* In determining whether a witness is equally available to the parties, each case must be examined on its own individual facts and circumstances. *Kelly by Kelly*, 798 S.W.2d at 701–02. Factors to consider are:

1. one party's superior means of knowledge of the existence and identity of the witness;

2. the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case; and

3. the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party against the other.

*Hill v. Boles*, 583 S.W.2d 141, 145–46 (Mo. banc 1979).

In *Kelly by Kelly*, Che Kelly was delivered by Dr. Darwin Jackson, an obstetrician. *Kelly by Kelly*, 798 S.W.2d at 700–01. Dr. Jackson was employed by Jonathan R. Reed, OB/GYN Services, Inc. *Id.* at 700. Che's parents sued Dr. Jackson and his employer, alleging that Dr. Jackson's medical negligence caused injury to Che's shoulder and brain damage during her birth. *Id.* at 701. Dr. Jonathan Reed attended Vera Kelly, Che's mother, several times prenatally. *Id.* Dr. Reed owned Jonathan Reed, OB/GYN Services, Inc. *Id.* Dr. Reed was not present during Che's delivery. *Id.* at 702. Dr. Reed's deposition was taken by the plaintiffs who directed their questions to the appropriateness of the procedures utilized by Dr. Jackson during delivery. *Id.* During the second day of trial, the plaintiffs selectively read portions of Dr. Reed's deposition to the jury, highlighting portions of Dr. Reed's testimony about forceps delivery. *Id.* During closing argument, the plaintiffs were refused permission to argue an adverse inference from defendants decision not to call Dr. Reed to testify. *Id.* at 701. Plaintiffs claimed that as president and sole owner of the defendant corporation which employed Dr. Jackson, Dr. Reed was not an "equally available" witness. *Id.* Recalling that it had "rejected the extreme holdings' of earlier cases, noting the 'impracticability of inflexible rules' in *Leehy v. Supreme Express & Transfer Co.*, 646 S.W.2d 786, 790, n. 4 (Mo. banc 1983), the Court stated, "Application of the *Hill v. Boles* factors should operate either 'to solidify or dispel' any presumption of availability arising from special relationships of a party and a witness, depending upon circumstances shown in evidence in a particular case." *Id.* at 702. Recognizing that Dr. Reed might be expected to testify in favor of the defendants, that he was endorsed by defendants as an expert witness, that he was president and sole owner of the defendant corporation, and that a judgment against the defendant corporation could result in unfavorable consequences to him, the Court stated that "under the law as it has developed" the plaintiffs could not assume a finding of unequal availability. *Id.* The Court, concluded that "Under [the circumstances in the case] there is nothing to suggest Dr. Reed's knowledge of the vital facts and circumstances relevant to delivery was not equally available to the parties." *Id.* at 703. The Court also noted that the "mere fact that defendants identified Dr. Reed as an expert and advised the jury that he would testify, then ultimately chose not to call Dr. Reed" does not create a presumption of unequal availability. *Id.*

In *Leehy v. Supreme Express & Transfer Co.*, the trial court permitted plaintiff to argue a negative inference after the defendant did not call a witness. *Leehy*, 646 S.W.2d at 790. The Supreme Court held the trial court erred in allowing the plaintiff to argue an adverse inference from the defendant's failure to call as a witness one of defendant's employees whose deposition had been taken. *Id.* at 790–91. The court determined that the plaintiff knew both of the existence and identity of the potential witness and his depo-

sition did not indicate that the witness was evasive or uncooperative. *Id.* at 791.

In *Robnett v. St. Louis University Hospital,* 777 S.W.2d 953 (Mo.App.1989), the Eastern District considered the question of whether physicians endorsed by the defendant as expert witnesses were equally available to both parties. A patient sought to recover damages from a hospital for injury to his right arm. *Id.* at 954. Prior to trial, the hospital identified two physicians in its answers to interrogatories as experts who might be used at trial. *Id.* at 955. In the presence of the patient's counsel, the hospital took the depositions of the experts to preserve their testimony for presentation at trial. *Id.* The hospital did not call either expert to testify even though the jury was told during the hospital's opening statement that they would testify. *Id.* The plaintiff patient was refused permission to argue an adverse inference from the hospital's failure to call the witnesses. *Id.*

In determining whether the physicians were equally available to both parties, the court in *Robnett* applied the factors set out in *Hill v. Boles.* *Id.* at 956. It first noted that the patient knew of the existence of the doctors and was also aware of the content of their testimony. *Id.* Additionally, the court noted that neither doctor had any stake in the outcome of the litigation. *Id.* It found that the doctors were retained on an hourly basis and paid for the time they spent preparing for the deposition. *Id.* They were not employees of the hospital, and they did not examine or treat the patient. *Id.* Based on these findings, the court determined that the witnesses were equally available to both parties and, therefore, the trial court did not err in precluding the patient from making a negative inference during closing argument. *Id.*

Application of the *Hill v. Boles* factors to the facts of this case shows that Dr. Wisner was equally available to both parties. First, Mr. Kampe knew of Dr. Wisner's existence and the content of his testimony. Mr. Kampe deposed Dr. Wisner and knew that Dr. Wisner was critical of Dr. Colom's treatment of Mr. Kampe. Although Dr. Wisner examined Mr. Kampe and testified for Dr.

Colom at pretrial hearings, he did not have a special relationship with Dr. Colom or even have any personal interest in the outcome of the litigation as Dr. Reed might have had in *Kelly by Kelly.* Like the physician experts in *Robnett,* Dr. Wisner was retained by Dr. Colom solely for his participation in the litigation. He was not employed by Dr. Colom. Dr. Wisner, therefore, was equally available to both parties, and the trial court erred in allowing Mr. Kampe to argue the adverse inference of Dr. Colom's failure to call Dr. Wisner to testify during closing argument. Because arguing the negative inference of Dr. Colom's failure to call the witness was error, Dr. Colom was prejudiced. *Kelly by Kelly,* 798 S.W.2d at 701.

## II.

Dr. Colom also asserts that the trial court erred in submitting the verdict directing instruction (Instruction No. 8) on the question of his purported medical negligence. He claims Instruction No. 8 did not conform to Rule 70.02 because the disjunctive paragraphs were misleading and confusing, duplicitous, argumentative, and contained both general and specific theories of negligence. Instruction No. 8 stated:

In your verdict you must assess a percentage of fault to defendant George A. Colom, M.D. if you believe:

First, defendant George A. Colom, M.D. either:

prescribed medications for plaintiff Carl Kampe at a time when he knew plaintiff Carl Kampe was consuming alcohol, or

prescribed medications for plaintiff in amounts and kinds which were not suitable for Carl Kampe's treatment, or

failed to monitor the medications he prescribed for Carl Kampe, or

gave alcoholic beverages to plaintiff Carl Kampe when he knew that plaintiff Carl Kampe was taking medications which should not be taken with alcohol, or

failed to warn plaintiff Carl Kampe of the dangers of consuming alcoholic beverages when taking the medications which defendant George Colom, M.D. had prescribed for him, or

failed to warn plaintiff Carl Kampe of the potential for dependency on the methamphetamine, amphetamine-like, Benzodiazepines and sleeping pills that were being prescribed for him, and

Second, defendant George A. Colom, M.D., in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff Carl Kampe.

Substantial guidance prescribes how MAI jury instructions shall be modified or how jury instructions shall be written when no MAI is appropriate. Rule 70.02(b) provides that

where an MAI must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given, then such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts.

### A. *Use of the word "monitor"*

First, Dr. Colom asserts that the first and third subparagraphs of paragraph First tainted Instruction No. 8 by encompassing several unstated specific theories of negligence in the general theories postulated. Dr. Colom claims that Instruction No. 8 impermissibly presented a general theory of negligence that permitted the jury to return its verdict based on alternative specific theories not included in the instruction. He argues that the jury, therefore, was permitted to speculate and determine for itself the unstated specific theory of recovery and was granted a "roving commission."

■ Dr. Colom objected to the instruction at the instruction conference and in his unsuccessful motion for a new trial thereby preserving the issue on appeal. His argument, however, addresses only the third subparagraph. Contentions not argued are considered abandoned. *Saunders–Thalden & Assoc., Inc. v. Thomas Berkeley Consulting Engineer, Inc.*, 825 S.W.2d 385, 387 (Mo.App.

1992). Thus, Dr. Colom abandons his claim as to the first subparagraph of paragraph First.

■ Dr. Colom claims that the third subparagraph of paragraph First permits at least three specific unstated theories of recovery, any of which the jury may have selected to render its verdict. He contends the jury could have determined that "failed to monitor the medications he prescribed for Carl Kampe" encompassed and permitted it to decide in favor of plaintiff on theories that Dr. Colom (1) failed to keep adequate records of prescriptions he prescribed to Mr. Kampe to determine whether he was renewing his prescription earlier than appropriate, (2) failed to recognize the side affects of long term use of amphetamines, or (3) failed to order "blood work up" tests to determine whether Mr. Kampe was taking the prescribed medication properly. Although expert testimony was offered as to each of these contentions, Dr. Colom asserts that none of the jurors were psychiatrists, and "a doctors failure to monitor [does not] have a commonly understood meaning."

■ A case may not be submitted to the jury on both disjunctive general and specific negligence charges. *Hicks v. Graves Truck Lines, Inc.*, 707 S.W.2d 439, 447 (Mo.App. 1986). Disjunctive general charges and specific negligence charges do not confine the jury to the factual issues but impermissibly permit it to speculate on other omissions or commissions. *Id.* The verdict directing instruction must "submit sufficient ultimate facts so as to make it clear to the jury what facts it must find in order to return a verdict against defendant." *Grindstaff v. Tygett*, 655 S.W.2d 70, 74 (Mo.App.1983).

In *St. Joseph's Hosp. v. Schierman*, 829 S.W.2d 4 (Mo.App.1991), a medical negligence case, a patient suffered a stroke because an excessive amount of the drug, Aramine, was administered to her in the emergency room of the plaintiff hospital. The hospital sued the patient's personal physician to obtain contribution based upon a settlement of the underlying medical malpractice suit. Dispute existed over the telephone directions conveyed by the non-present personal physician to the hospital emergency room

physician who administered the drug. A portion of plaintiff's verdict directing instruction required the jury, in order to find for the plaintiff hospital, to find that the defendant personal physician "failed to adequately communicate with [the hospital emergency room physician] regarding the giving of Aramine." *Id.* at 6.

The Eastern District determined this portion of the verdict finding instruction was defective because it was a generalized theory of negligence that allowed the jury to speculate why and in what manner the personal physician "failed to adequately communicate," giving the jury a "roving commission." *Id.* The court said the plaintiff's "general theory of negligence gave the jury no guidance, was confusing and misleading." *Id.* The court articulated that submitting the hospital's case in the disjunctive on both general and specific negligence impermissibly allowed the jury to speculate as to what was the wrongful conduct. *Id.*

In another medical malpractice case, *Grindstaff v. Tygett*, 655 S.W.2d 70, 72 (Mo. App.1983), defendant claimed plaintiff's verdict directing instruction was prejudicially erroneous, was ambiguous, and gave the jury a "roving commission" to determine what the instruction meant. The jury was to find for the plaintiff if it believed "defendant performed a midforceps rotation delivery when such procedure was not medically proper." *Id.* The Eastern District determined that the phrase "not medically proper" failed to submit the ultimate facts which defined the specific theory of negligence. *Id.* at 73. The court noted that the plaintiff's negligence theories were based in expert testimony and that the experts defined the conditions under which the procedure of a midforceps rotation delivery is proper and the conditions under which it is improper. It reasoned that the instruction could have been interpreted in a number of ways by the jury, thus giving it a "roving commission" to speculate and determine on its own why and in what manner the procedure was "not medically proper."

The present case is distinguishable from *Schierman* and *Grindstaff.* The phrase "failed to monitor the medications he prescribed for Carl Kampe" in subparagraph three, paragraph First of the verdict finding instruction sufficiently submits the ultimate facts which define for the jury Mr. Kampe's specific theory of negligence. The instruction in *Grindstaff* required the jury to speculate and utilize medical expertise that it did not possess. The defective instruction required the jury to determine that uncertain professional conduct was not medically appropriate. Likewise, the instruction in *Schierman* required the jury to determine whether the telephone communication between the emergency room physician and the patient's physician was "adequate." Thus, the instruction required the jury of laymen to determine whether nonspecific medical information communicated by one medical expert to the other was adequate for the second medical expert to properly treat the patient.

Neither is the word "monitor" a scientific word that expert testimony must define to aid the jury. It does not compel the jury to employ an expertise that it lacks. The word is not an infrequently used word or a word of specific legal meaning that should be defined for the jury. To a reasonable person, the word "monitor," as used in subparagraph three, when applied to the evidence in this case, asks whether Dr. Colom observed, oversaw, supervised, or regulated Mr. Kampe's use of the medication he prescribed. The *subparagraph of the instruction is sufficiently* explicit, and the exact method by which Dr. Colom could have "observed, overseen, supervised, or regulated" the amount of medication prescribed and ingested by Mr. Kampe as Dr. Colom's patient need not be determined by the jury. Subparagraph third of paragraph First did not grant the jury a "roving commission."

■ Dr. Colom also claims subparagraph three of paragraph First was confusing. In support of his claim, he refers to the questions asked by the jury during deliberation about subparagraph three. During deliberation, the jury asked, "# 3 fail to monitor medications given to Carl—Does this mean 'in writing' in 'Dr. Colom's memory', Is it a specific period of time—all 17 years? Does this mean blood work or medical tests." The jury's query about subparagraph three does not taint the instruction as suggested by Dr.

Colom. If this were the criterion, each question submitted by a jury about an instruction would render the instruction error. The jury's inquiry may be considered in determining the propriety of a contested instruction, but the query is not conclusive.

### B. *Duplicitous theories*

■ Dr. Colom next claims that Instruction 8, subparagraph two, that the jury was compelled to assess a percentage of fault against Dr. Colom if it believed he "prescribed medications for plaintiff Carl Kampe at a time when he knew plaintiff Carl Kampe was consuming alcohol," and subparagraph four that Dr. Colom "gave alcoholic beverages to plaintiff Carl Kampe when he knew that plaintiff Carl Kampe was taking medications which should not be taken with alcohol" were duplicitous, argumentative, and prejudicial. The two submissions are not duplicitous. Each is specific. Subparagraph two presents the claim of prescribing medication knowing Mr. Kampe to be consuming alcohol, and subparagraph four presents the claim of giving alcohol to Mr. Kampe knowing him to be consuming medication. Although the result may be the same, the act the jury was required to find to have been committed by Dr. Colom was not the same.

### C. *Claim of Ambiguous Subparagraphs and Insufficient Evidence*

■ Dr. Colom claims subparagraphs first, fourth, and fifth of paragraph First are ambiguous and confusing and do not comply with Rule 70.02 because they are susceptible to more than one interpretation. He claims the subparagraphs are ambiguous because they do not define "either the type of medication, the dosage, the quantity of alcohol, [or] the timing of when one could be consumed in relation to the other." The subparagraphs are again presented:

Subparagraph first:

  prescribed medications for plaintiff Carl Kampe at a time when he knew plaintiff Carl Kampe was consuming alcohol, or

Subparagraph fourth:

  gave alcoholic beverages to plaintiff Carl Kampe when he knew that plaintiff Carl Kampe was taking medications which should not be taken with alcohol, or

Subparagraph fifth:

  failed to warn plaintiff Carl Kampe of the dangers of consuming alcoholic beverages when taking the medications which defendant George Colom, M.D. had prescribed for him.

Dr. Colom prescribed numerous medications for Mr. Kampe over seventeen years. The evidence was explicit as to the medications prescribed. The evidence disclosed that Mr. Kampe was alcohol dependent and that Dr. Colom knew of Mr. Kampe's alcohol dependency. The evidence also revealed that Mr. Kampe consumed the prescribed medication when he was also consuming alcohol. Although the evidence disclosed that drinking two beers a day and "being on Valium" might not be harmful, Mr. Kampe consumed numerous other drugs as he ingested greater quantities of alcohol than two beers a day. Expert testimony was presented that the consumption of alcohol and prescriptive drugs harmed Mr. Kampe.

The language of each of the contested subparagraphs do not breach the provisions of **Rule 70.02(b)**. The subparagraphs were simple, brief, impartial, and did not require the jury to make findings of detailed fact. The referenced subparagraphs adequately state the theory of recovery asserted by Mr. Kampe.

Instruction No. 8 was not improper. Dr. Colom's point II is denied.

### *Mr. Kampe's Appeal*

■ Mr. Kampe claims that the trial court erred in failing to grant his motion for directed verdict on Dr. Colom's statute of limitation defense to his claim of battery and in submitting Instruction No. 17 regarding the defense. Count II of Mr. Kampe's third amended petition asserted that while he was mentally incapacitated and being treated by Dr. Colom for his mental condition, Dr. Colom "committed battery upon [him] by offensively touching [his] person on or about [his] genitals and by having deviate sexual intercourse with [him] . . . by engaging in oral sex on [him] without [his] consent." Mr.

Kampe's petition asserted that the purported misconduct occurred in Nebraska on or about May 15, 1986. He claimed injury as a result of Dr. Colom's alleged misconduct, and he sought compensatory and punitive damages for the alleged battery. Dr. Colom pleaded **section 516.140, RSMo 1986,** the Missouri statute of limitation, as an affirmative defense in his amended answer to Mr. Kampe's claim.

Mr. Kampe claims that Dr. Colom pleaded the wrong statute of limitations and that Dr. Colom was precluded from relying on any other statute of limitations. Mr. Kampe claims that **section 516.190, RSMo 1986,** the "borrowing statute," was the applicable statute of limitations in this case because the alleged misconduct purportedly occurred in Nebraska on or about May 15, 1986. He asserts Dr. Colom, thereby, waived any statute of limitations defense not pleaded, including any applicable Nebraska statute of limitations. Thus, he asserts that the court misinstructed the jury by submitting the Missouri statute of limitations, **section 516.140,** and in not directing the jury that the Nebraska statute of limitations applied and permitting the jury to find that the Nebraska statute was tolled (Instruction No. 17).

■ Section 516.190, RSMo 1986, Missouri's "borrowing statute", provides for application of the applicable foreign statute of limitations to suits filed in Missouri courts when the alleged cause of action accrued in the foreign jurisdiction and the foreign statute of limitations would serve as a bar to prosecution of the claim in the foreign jurisdiction. The borrowing statute provides:

> Whenever a cause of action has been fully barred by the laws of the state, territory or country in which it originated, said bar shall be a complete defense to any action thereon, brought in any of the courts of this state.

§ 516.190, RSMo 1986. Thus, **section 516.190** makes the statute of limitations of a sister state in which a cause of action originated the law of Missouri where the law of the sister state denies the suitor remedy. *Jenkins v. Thompson,* 251 S.W.2d 325, 327–28 (Mo.1952) (citing *Farthing v. Sams,* 296 Mo. 442, 247 S.W. 111, 113 (Mo.1922)). The borrowing statute does not, however, apply where the foreign statute of limitations does not fully bar the cause of action, and the Missouri statute of limitations does. *Farthing v. Sams,* 296 Mo. 442, 247 S.W. 111, 113 (Mo.1922).

■ Generally, when borrowing the statute of limitations of a foreign state, the applicable tolling provision of that state is borrowed as well. *Thompson by Thompson v. Crawford,* 833 S.W.2d 868, 872 (Mo. banc 1992). The Nebraska tolling provision provides that when a cause of action accrues against an individual and the individual is out of state, "the period limited for the commencement of the action shall not begin to run until he comes into the state." **NEB. REV.STAT.** § 25–214 (1994).

Evidence presented at trial showed that Mr. Kampe and Dr. Colom returned to Missouri on May 26, 1986. There was no evidence that Dr. Colom ever returned to Nebraska. The Nebraska statute of limitations, therefore, was tolled during the time that Dr. Colom was absent from the state. Because the Nebraska statute of limitations was tolled by Dr. Colom's absence, it did not fully bar the cause of action before Missouri's two year statute of limitations. Thus, the borrowing statute, § 516.190, RSMo 1986, was not applicable in this case. The Missouri statute of limitations, § 516.140, RSMo 1986 as pleaded by Dr. Colom, was the applicable statute in this case. Whether the trial court erred in declining to grant Dr. Colom's motion for directed verdict on the statute of limitations defense need not be addressed.

Mr. Kampe's point is denied.

The judgment awarding Mr. Kampe actual and punitive damages against Dr. Colom is reversed, and the case is remanded for a new trial on plaintiff's claims for compensatory and punitive damages as to medical malpractice. The judgment entered following the defendant's verdict on Mr. Kampe's claim for battery is affirmed.

All concur.