with a firm impression that a mistake was made by the trial court.

## CONCLUSION

Respondent's convictions and sentences are affirmed. The motion court's order granting respondent's Rule 29.15 motion is reversed.

All concur.

Marcus Dwane WILLIAMS, Respondent,

v.

**CASUALTY RECIPROCAL EXCHANGE, Appellant.**

No. WD 50579.

Missouri Court of Appeals, Western District.

July 16, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 27, 1996.

Application to Transfer Denied Oct. 22, 1996.

Paul Hasty, Jr., Arlen L. Tanner, Wallace, Saunders, Austin, Brown and Enochs, Chartered, Kansas City, for appellant.

Robert K. Ball, II, William H. Seaton, Kansas City, for respondent.

Before LAURA DENVIR STITH, P.J., and ULRICH and SMART, JJ.

LAURA DENVIR STITH, Presiding Judge.

Casualty Reciprocal Exchange (Casualty) appeals from a jury verdict in the amount of $40,000 in favor of Marcus Dwane Williams. Casualty is the uninsured motorist carrier for Mr. Williams' employer and raises two points on appeal. First, Casualty argues the trial court erred in permitting plaintiff to argue an adverse inference based on Casualty's failure to call a medical doctor to testify on issues relevant to damages. We agree that the doctor was equally available and thus the trial court erred in permitting plaintiff to argue the inference. We find, however, that on the particular facts of this case, plaintiff overcame the presumption of prejudice which arose as a result of this improper inference.

Casualty also argues the trial court erred in denying its motion for credit for workers' compensation benefits received by Mr. Williams in that such an offset was contractually required in the policy. Alternatively, Casualty argues the trial court erred in denying an offset as to amounts over $25,000, the statutorily required minimum for uninsured motorist coverage. We find that public policy required coverage up to $25,000, and that Casualty's failure to introduce the policy provision in question precludes it from arguing that the policy contractually entitled it to credit for the amounts over $25,000. Accordingly, we affirm.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

On August 9, 1984, Mr. Williams was working in the course and scope of his employment as a delivery driver when he was struck by a vehicle driven by Harold Margolin. While Mr. Margolin was not injured in the accident, Mr. Williams was injured, although

the severity of his injuries is disputed. Mr. Williams brought a workers' compensation claim against his employer, for which he was awarded $35,799.55 in workers' compensation benefits. He also brought suit against Mr. Margolin. Because Mr. Margolin was uninsured, Mr. Williams included in the suit defendant Casualty, as Casualty was his employer's uninsured motorist carrier. Prior to trial in 1994, Mr. Williams dismissed his claim against Mr. Margolin and proceeded only against Casualty.

Casualty conceded Mr. Margolin's fault, and the only issue submitted to the jury was the amount of Mr. Williams' damages. Mr. Williams presented evidence that he suffered serious, permanent, and debilitating injuries, while Casualty contested the severity of his injuries and whether those injuries were really caused by the accident.

The record indicates that Mr. Williams was brought to Trinity Lutheran Hospital immediately after the accident on August 9, 1984, where he complained of dizziness and pain in his head, neck, knee, back and face. With the exception of his statement that he thought he had lost consciousness, emergency room records showed no head injury when Mr. Williams was first admitted to ICU for observation. The emergency room doctor described Mr. Williams as being alert and coherent and his EEG, x-rays and CT scan were normal. Additional evidence from tests performed by Dr. Johnette LaBrie and other doctors to whom Dr. LaBrie referred Mr. Williams, however, indicated that he suffered from a brain stem contusion, cerebral concussion, a severe cervical sprain, diminished hearing in the left ear, blurred vision and soft tissue injury to the left shoulder and knee.

As a result of his injuries, persistent headaches and pain, Mr. Williams remained in Trinity Lutheran Hospital from August 9, 1984 until August 31, 1984, and received physical therapy and anti-inflammatory medications while under the principal care of Dr. LaBrie. After being discharged, Mr. Williams continued to experience pain in his head and neck, numbness in his left arm and hand and sleep disturbances.

Almost two years later Mr. Williams, still under the Dr. LaBrie's care, was admitted to St. Mary's Hospital from June 30, 1986, to July 10, 1986, with a diagnosis of "reactive depression." Dr. LaBrie testified at trial that an EMG taken at the time of this hospitalization showed evidence of C–6 radiculopathy, or damage to a nerve in Mr. Williams' neck. Dr. LaBrie further testified that Mr. Williams' numbness in his left hand resulted from the damaged nerve in his neck; that he had sustained irreparable brain cell damage from a closed head trauma; that he suffered a hearing loss in his left ear and occipital neuralgia; and that the latter condition accounted for his severe and persistent headaches.

Finally, Dr. LaBrie testified that in 1994, she had performed a "sleep test" on Mr. Williams which revealed a "malfunction" in Mr. Williams' brain. Dr. LaBrie did not explicitly indicate that this brain malfunction was connected to Mr. Williams' 1984 accident, but did say that the sleep test confirmed her previous diagnosis that Mr. Williams suffered from a sleep disorder. In addition, Dr. LaBrie offered the opinion that Mr. Williams had a psychological disability of 100% and a physical disability of 80% as a result the collision with Mr. Margolin. Dr. LaBrie further testified that Mr. Williams' injuries were permanent.

Mr. Williams also presented evidence that at the time of trial he had incurred or was reasonably anticipated to incur in the future $28,060.70 to $31,060.70 in special damages as a result of these hospitalizations and of his other medical treatment.[1] The evidence showed that Mr. Williams was 38 years old and had a life expectancy of from 35 to 46 years.

Casualty contended at trial that Mr. Williams' injuries were not as severe as claimed and that all or most of his injuries were not caused by the accident with Mr. Margolin in 1984. Rather, it suggested, the injuries were caused by other accidents, and the extent of the injuries was exaggerated.

---

1. These figures include $21,060.70 in actual medical expenses and, in Dr. LaBrie's estimation, $7,000 to $10,000 for possible future surgical treatment.

Casualty pursued this defense only through cross-examination of Mr. Williams' witnesses. It rested its case at the close of Mr. Williams' evidence.

During closing arguments, counsel for Mr. Williams suggested that an award of $750,000 would be appropriate in this case given the severity and permanence of Mr. Williams' injuries. Over objection, he was also permitted to argue that the jury could draw an inference adverse to defendant from the fact that defendant has listed Dr. Ernest Neighbor as an expert witness, but then had rested without calling him. The jury returned a verdict of $40,000 in favor of Mr. Williams. Casualty appeals.

## II. ARGUMENT OF ADVERSE INFERENCE

Casualty first claims the trial court erred in permitting Mr. Williams to argue that an adverse inference should arise from its failure to call Dr. Neighbor. Dr. Neighbor had been hired by Casualty to examine Mr. Williams in 1993. Mr. Williams tape recorded and transcribed the oral portions of Dr. Neighbor's examination. Dr. Neighbor was later deposed with Mr. Williams' counsel present and participating. Dr. Neighbor was listed as an expert, but Casualty rested without calling any witnesses, including Dr. Neighbor.

During closing argument, without first notifying the court or Casualty that he would do so, Mr. Williams' counsel argued as follows:

[MR. BALL]: You know that Marcus Williams underwent examination by Dr. Ernest Neighbor on behalf of the insurance company, Casualty Reciprocal Exchange. You heard nothing from Dr. Ernest Neighbor. You have a right under our law to assume that the evidence Dr. Neighbor would have been—

MR. HASTY [counsel for Casualty]: Judge, that's improper, I ask you to strike that and instruct the jury to disregard it. That's improper argument.

THE COURT: Objection is overruled, you may continue.

MR. BALL: Thank you. Under the law, we have what is called [the] adverse inference rule and that rule is that whenever—

MR. HASTY: Your Honor, may I have a continuing objection on that issue, I think that's improper.

THE COURT: Certainly.

MR. HASTY: Thank you.

MR. BALL: Whenever one has control over a witness that he has an obligation to bring that witness, you have a right to assume that what that witness would say would be adverse to his position if he doesn't bring that witness before you. And I suggest to you, that is exactly the situation with Dr. Neighbor.

Casualty later moved to strike the testimony and for a mistrial.[2] Both requests were denied.

Casualty argues that Dr. Neighbor was equally available to both parties in that respondent had "full and complete knowledge of the existence and identity" of Dr. Neighbor; the doctor's deposition disclosed the nature of the testimony that he was expected to give;[3] and he was "retained solely for his participation in the litigation" and "he did not have any personal interest in the outcome. . . ." Casualty argues that it was thus error to permit plaintiff's counsel to argue an adverse inference based on Casualty's failure to call Dr. Neighbor.

■ We agree. It is well settled that the failure of a party to call a witness who has knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to offer it. *Kampe v. Colom*,

2. We have some doubts as to whether this objection was sufficiently specific to preserve any error in argument of the inference for review. As respondent does not claim the issue is not preserved, and as we find, *infra*, that no prejudice resulted from the inference, we need not finally resolve this issue. We do note that it appears the court and parties fully understood the basis of

the objection, and further that Casualty later fully detailed the basis of its objection in the conference which followed plaintiff's closing argument.

3. *Neither party discusses in its brief whether Dr. Neighbor's deposition testimony was in fact favorable to the defense.*

906 S.W.2d 796, 801 (Mo.App.1995) (citing *Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 701 (Mo. banc 1990)). It is also well settled, however, that it is error to allow a party to argue such an adverse inference if the witness is equally available to both parties. *Kampe*, 906 S.W.2d at 802.

■ In determining whether a witness is equally available, each case must be examined on its individual facts and circumstances. *Id.* This was made clear in *Hill v. Boles*, 583 S.W.2d 141 (Mo. banc 1979), in which the Missouri Supreme Court was faced with the issue whether a party's treating and examining physician is always more available to that party. *Hill* held that the courts should not follow an inflexible rule, permitting the inference to be made based solely on the formal relationship of the parties. Rather, the Court said, the following factors should be considered in determining whether a witness is equally available:

1. one party's superior means of knowledge of the existence and identity of the witness;

2. the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case; and

3. the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party against the other.

*Id.* at 145–46.

*Leehy v. Supreme Express & Transfer Co.*, 646 S.W.2d 786, 790 (Mo. banc 1983), applied the *Hill* factors. In so doing, it reaffirmed that an inference should not be permitted merely based on a single factor, such as that a party has hired the person as an expert or listed the expert as a witness for trial, or because of an employer-employee relationship. Similarly, the inference should not be rejected merely because the opposing party has deposed the expert. Rather, *Leehy* teaches, the presence of one of these factors creates a presumption "regarding the availability of the witness and that in a proper case this presumption may be held inapplicable by reason of the circumstances shown in evidence." *Id.* at 791 n. 4. At that point, application of the *Hill* factors "should operate either 'to solidify or dispel' any presumption of availability arising from special relationships of a party and a witness, depending upon circumstances shown in evidence in a particular case." *Kampe*, 906 S.W.2d at 802.

This Court recently applied the principles of *Leehy* and *Hill* in *Kampe, supra.* We noted that the *Kampe* plaintiff had deposed the expert, and therefore knew of the existence of the expert and the content of his expected testimony. Plaintiff was also aware that the expert was solely retained for trial and had neither a special relationship with defendant nor an interest in the outcome of the case. On these facts, *Kampe* held, application of the *Hill* factors led to the conclusion that plaintiff should not have been permitted to argue an adverse inference from defendant's failure to call the expert at trial. *Id.* at 802–03.

■ Application of the *Hill* factors requires the same result here. In this case, as in *Kampe* and *Leehy*, plaintiff had deposed the expert. As a result, neither party had "a superior means of knowledge of the existence and identity of the witness." *Hill*, 583 S.W.2d at 145. The first *Hill* factor thus did not favor permitting an adverse inference to be drawn. Neither party sets out what Dr. Neighbor's anticipated testimony would have been, thus precluding detailed consideration of the second *Hill* factor, which directs us to consider the nature of the testimony which the missing witness would have offered. At most, we can infer from the parties' silence only that the testimony would have been of mixed value.

Finally, the evidence showed that Casualty hired Dr. Neighbor merely to examine the plaintiff and then identified him as an expert. The doctor was not an employee of defendant nor a treating physician of plaintiff, and there was nothing about his relationship to a particular party which "would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor

of the one party against the other." *Hill,* 583 S.W.2d at 145–46. *See also Robnett v. St. Louis Univ. Hosp.,* 777 S.W.2d 953, 956 (Mo.App.1989). The third factor thus also did not favor permitting the jury to draw an adverse inference. In these circumstances, it was error to permit plaintiff to tell the jury that it could draw such an inference.

The question remains whether the error in arguing an adverse inference was prejudicial. Casualty suggests that prejudice automatically results, citing *Kampe,* 906 S.W.2d at 803, and *Kelly,* 798 S.W.2d at 701. We do not agree that such a conclusive presumption is appropriate, however, at least where, as here, the inference concerns the amount of damages rather than the existence of liability,

A number of early Missouri cases held that no prejudice will be found where an adverse inference was improperly allowed or disallowed on the issue of damages unless defendant also shows that the resulting verdict was excessive. For example, in *Davis v. City of Independence,* 404 S.W.2d 718 (Mo. banc 1966), the Missouri Supreme Court directly addressed this issue under facts remarkably similar to those in the case at bar, as follows:

> Plaintiff received a verdict of $6,000. Her injuries were rather severe....There was substantial evidence, objective and subjective, of permanent injury and of resulting disabilities. *In view of the size of the verdict, we cannot find that the argument complained of had any prejudicial effect upon the amount of damages, and indeed defendant does not make any point of excessiveness. In such situations ... neither improper argument nor improper evidence should be held prejudicial.*

*Davis,* 404 S.W.2d at 721 (emphasis added). *See also Douglas v. Hoeh,* 622 S.W.2d 765, 766–67 (Mo.App.1981).

Missouri at one time applied a similar rule in other cases in which it was alleged that an error in closing argument had affected the amount of damages awarded. In such situations, the courts held, the error was not prejudicial unless plaintiff also proved the damages awarded were excessive, a standard clearly not met in the instant case. *See, e.g., Chambers v. City of Kansas City,* 446 S.W.2d 833, 841 (Mo.1969); *Bennett v. Kitchin,* 400 S.W.2d 97, 104 (Mo.1966).

*Tune v. Synergy Gas Corp.,* 883 S.W.2d 10, 21 (Mo. banc 1994), however, specifically overruled the approach taken in *Chambers* and similar cases involving closing argument errors, instead adopting the rule set out in *Lester v. Sayles,* 850 S.W.2d 858, 864 (Mo. banc 1993), that:

> the party responsible for error relating to argument on the issue of damages **is charged with a rebuttable presumption that the error was prejudicial.** Cases holding that error in argument on the issue of damages is prejudicial only if there is an excessive verdict are overruled to the extent they are inconsistent with this opinion.

*Tune,* 883 S.W.2d at 22.

While *Tune* did not cite or directly refer to cases which dealt with arguing an adverse inference in regard to a damages witness, we think that the principle it announced is applicable in that situation as well. We further note that *Tune's* approach is consistent with the approach taken in certain recent cases in which the adverse inference was permitted as to a witness whose testimony would have addressed a liability issue. At least two of these cases apply the general rule regarding deference to the trial court's discretion in determining whether prejudicial error occurred, while another specifically states that an improper adverse inference argument is "presumptively prejudicial." [4]

---

4. *See, e.g., Stojkovic v. Weller,* 802 S.W.2d 152, 156 (Mo. banc 1991) (even assuming it was error to allow defendant to argue adverse inference as to treating doctor, "the prejudicial effect thereof is within the discretion of the trial court, and there is no abuse of discretion here"); *Piper v. Missouri Pac. R.R.,* 847 S.W.2d 907, 911 (Mo. App.1993) (refusal to allow defendant to argue adverse inference error and "[g]iven the closeness of the issue of causation we cannot conclude the error was not prejudicial"); *Routh v. St. John's Mercy Medical Center,* 895 S.W.2d 744, 749 (Mo.App.1990) ("The trial court erred in refusing to allow plaintiffs' use of the adverse inference. Such error is presumptively prejudicial").

Applying the *Tune* standard here, we note that the defendant conceded liability, and the case was tried only on the issue of damages. The plaintiff asserted special damages of $28,060.70 to $31,060.70. In addition, plaintiff presented testimony that he was 100% psychologically disabled and 80% physically disabled as a result of the injuries, that he had experienced pain, dizziness and frustration due to the limitations imposed and personality changes experienced as a result of the accident, that he had numbness in his left hand, irreparable brain cell damage, a hearing loss and severe and persistent headaches. The record also shows that he received $35,799.55 in workers' compensation benefits.

■ The jury was not required to accept Mr. Williams evidence. To the contrary, the award of only $40,000 on a request for $750,000 indicates that the jury accepted much of defendant's argument that most of plaintiff's injuries were not attributable to the accident for which the defendant was responsible. However, it is the very smallness of the verdict which rebuts the presumption of prejudice from argument of the adverse inference, for the small size of the verdict indicates the jury resolved the conflicting evidence in defendant's favor. Accordingly, we find the error was not prejudicial and affirm the judgment.

### III. WHETHER AN OFFSET SHOULD BE ALLOWED FOR WORKERS' COMPENSATION BENEFITS

Casualty next argues the trial court erred in denying its motion requesting credit on the $40,000 judgment for the $35,799.55 in workers' compensation benefits received by Mr. Williams. Casualty says its uninsured motorist policy contains the following provision which Casualty claims contractually requires that the verdict be offset by the money paid to Mr. Williams on his workers' compensation claim for injuries related to the accident:

Any amounts otherwise payable for damages under this coverage shall be reduced by all sums ... paid or payable because of the bodily injury under any of the following or similar law ...

(a) worker's compensation law.

Based on that policy provision, Casualty argues that its liability is limited to $4,200.45, or the difference between the $40,000 verdict and the $35,799.55 in workers' compensation benefits. Alternatively, Casualty argues the trial court erred in not applying an offset to amounts over $25,000 (the statutory minimum for uninsured motorist coverage). Under that argument, Casualty contends it is liable for only $29,200.45, or $25,000 plus $4,200.45.

#### A. Full Enforcement of Offset Provision

■ We must first determine whether Casualty's contractual offset provision is fully enforceable. Casualty argues that the offset is required to prevent double recovery by plaintiff, who will recover damages once from the insurer and again from the carrier.

■ We agree that the general rule is that a party cannot be compensated for the same injury twice. *Moreland v. Columbia Mut. Ins. Co.*, 842 S.W.2d 215, 226 (Mo.App.1992). As Casualty admits, however, Missouri has specifically and repeatedly rejected identical arguments that this principle applies so as to permit an offset against the required minimum uninsured motorist limits where plaintiff has also recovered workers' compensation benefits. *See Cano v. Travelers Ins. Co.*, 656 S.W.2d 266, 270 (Mo. banc 1983), and *Douthet v. State Farm Mut. Auto. Ins. Co.*, 546 S.W.2d 156, 159 (Mo. banc 1977).

*Douthet* recognized that section 379.203 specifically requires automobile "insurance policies to provide uninsured motorist coverage 'in not less than the limits for bodily injury or death set forth in section 303.030, RSMo, for the protection of persons insured thereunder.'" 546 S.W.2d at 157. Section 379.203 has not changed in any relevant respects since *Douthet*. Chapter 303 of the Missouri statutes contains the Motor Vehicle Financial Responsibility Law (MVFRL). The MVFRL requires each automobile liability policy to include $25,000 coverage for bodily injury to or death of one person in any one accident. §§ 303.030.5, 303.190.2(2). Uninsured motorist policies therefore must provide at least $25,000/$50,000 in coverage.

In compliance with these statutes, Casualty's policy provided uninsured coverage of up to $500,000. However, Casualty also alleges it included the provision in question, which in effect deleted such coverage for persons who also had other insurance or who recovered damages from a workers' compensation carrier. As both *Cano* and *Douthet* state, the public policy expressed in Section 379.203 is violated by such an exclusion, for it in effect provides no or limited uninsured motorist coverage for those who have other sources of recovery. It thus conflicts with the statutory requirement of uninsured motorist coverage, and hence is void up to the minimum amount of coverage required by Chapter 303. *Cano,* 656 S.W.2d at 270; *Douthet,* 546 S.W.2d at 159. *See also Yaakub v. Aetna Cas. & Sur. Co.,* 882 S.W.2d 743, 745 (Mo.App.1994); *Barker v. Palmarin,* 799 S.W.2d 117, 118 (Mo.App.1990) (both holding, in the converse situation, that a workers' compensation carrier is not entitled to an offset for uninsured motorist proceeds paid to an insured).

■ Moreover, far from agreeing with Casualty that to deny the offset would permit double recovery by the plaintiff, Missouri courts have instead held that to permit the offset would give the insurer a windfall, for it would permit it to avoid liability simply because of the happenstance that the accident was also covered by other, contracted for, insurance. For this reason, if any party is to receive a windfall, Missouri has specifically determined that it should be the claimant. *Douthet,* 546 S.W.2d at 159; *Steinhaeufel v. Reliance Ins. Cos.,* 495 S.W.2d 463, 467 (Mo. App.1973).[5]

Based on the holdings in *Cano* and *Douthet,* public policy prohibits enforcement of the offset provision contained in Casualty's uninsured motorist policy up to $25,000. Thus, Casualty is contractually obligated under its policy to pay Mr. Williams at least $29,200.45.

**B.   *Partial Enforcement of Offset Provision***

■ Casualty alternatively argues the offset provision should be enforced above the statutory minimum because there are no public policy reasons preventing such enforcement. We agree that parties to an insurance contract are free to include mutually agreed upon limitations and restrictions where such limitations and restrictions do not conflict with a statute or public policy. *Webb v. State Farm Mut. Auto. Ins. Co.,* 479 S.W.2d 148, 150 (Mo.App.1972).

We also agree that *Cano* and *Douthet* do not explicitly require that the policy be held unenforceable above the $25,000 statutory minimum, and that Missouri has held that household exclusion provisions contained in uninsured motorist policies are enforceable for amounts in excess of $25,000. *Halpin v. American Family Mut. Ins. Co.,* 823 S.W.2d 479, 483 (Mo. banc 1992); *State Farm Mut. Auto. Ins. Co. v. McGuire,* 905 S.W.2d 150, 153 (Mo.App.1995). For this reason, and to avoid what they deem double recovery by the insured, some courts enforce such contractual limitations as to workers' compensation benefits for that portion of a judgment which is in excess of the statutory minimum. *See* Larson, *The Law of Workmen's Compensation,* § 71.23(h), Vol. 2A, (1995); Jeffrey L. Cole, Annot., *Uninsured and Underinsured Motorist Coverage: Validity, Construction, and Effect of Policy Provision Purporting to Reduce Coverage By Amount Paid or Pay-*

---

5. Casualty also cited a portion of Section 379.203.4 in support of its claim that an offset should be allowed. The portion cited does state in part that an insurer should receive the proceeds of any settlement or judgment "resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made...." However, when this statement is considered in the context of the entire statute, it is clear that it refers only to an offset for recovery from a *tortfeasor.* Workers' compensation payments are not based upon an employer's tort liability, but rather "[t]he pur-

pose of workers' compensation is to make industry bear the burden of compensating employees for injuries arising out of the scope and course of employment." *Gaston v. J.H. Ware Trucking, Inc.,* 849 S.W.2d 70, 74 (Mo.App.1993). Additionally, "the [workers' compensation] law is to be broadly and liberally interpreted ... and is intended to extend its benefits to the largest possible class ... any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee." *Id.* (citation omitted). For these reasons, we reject Casualty's argument.

*able Under Workers' Compensation Law*, 31 A.L.R. 5th 116 (1995).[6]

Neither Larson nor Cole cite Missouri cases supporting this position, however, and the only Missouri case we have found, *Barker*, 799 S.W.2d at 118–19, appears to reach the opposite result, but does so only in *dicta*. In *Barker*, this Court held that the workers' compensation statutes do not allow an employer's compensation carrier, which had previously paid benefits to an employee, to be subrogated to the employee's claim against the uninsured motorist carrier. *Id.* at 117–18. In so holding, this Court relied on *Travelers Ins. Co. v. National Farmers Union Prop. & Cas. Co.*, 252 Ark. 624, 480 S.W.2d 585 (1972). *Travelers* held void a clause purporting to offset an uninsured motorist carrier's liability against the workers' compensation benefits paid to the insured. 480 S.W.2d at 590. In considering the basic purposes of the Arkansas worker's compensation laws, the court wrote:

> [T]he legislature did not intend that the Uninsured Motorist Act be the means of discrimination against working people protected under the workmen's compensation laws.... Analogy of the subrogation right of the compensation carrier to the right of the [uninsured] carrier to reduce its liability is inappropriate. The subrogation right is for the protection of the compensation carrier. The right claimed by [the uninsured carrier] would simply provide it with a windfall in the case of one covered by the workmen's compensation laws. The purpose of the Uninsured Motorist Act was to protect the insured, not the insurer.

*Id.* at 591.[7] *Barker* found this consistent with the rationale of *Cano*, which it said was that "uninsured benefits should not be reduced to injured motorists just because

worker's compensation also applied to the injuries." *Barker*, 799 S.W.2d at 119.

We need not finally resolve whether to follow *Travelers* or the approach suggested by Larson and Cole, for we instead dispose of this issue on procedural grounds. Specifically, while Casualty claims that its policy contains the offset provision discussed above, it failed to introduce this provision at trial. It was first mentioned only in Casualty's Memorandum in Support of Motion for New Trial. Casualty argues that the issue should nonetheless be considered preserved because respondent did not dispute either the accuracy or the existence of the offset provision in its brief on appeal, citing *Woodard v. Director of Revenue*, 876 S.W.2d 810, 811 (Mo. App.1994) (where fact is asserted in one party's brief and conceded to be true in the adversary's brief, we may consider it as though it appears in the record).

 While Mr. Williams does not directly deny in his brief that such an offset provision existed, neither does he admit it was in the policy. Instead, he argues that Casualty has waived any claim to an offset because it failed to introduce the provision at trial and thus failed to adduce any evidence to support its claim of offset. We agree. Accordingly, we affirm.

All concur.

**6.** *See also Fox v. Atlantic Mut. Ins. Co.*, 132 A.D.2d 17, 521 N.Y.S.2d 442 (2 Dep't.1987), *cited with approval in Valente v. Prudential Prop. & Cas. Ins. Co.*, 77 N.Y.2d 894, 568 N.Y.S.2d 901, 571 N.E.2d 71 (1991); *Poulos v. Aetna Cas. & Sur. Co.*, 119 R.I. 409, 379 A.2d 362, 365 (1977) (permitting "deduction of worker's compensation benefits only to the extent that they represent a double recovery" and to extent over the minimum mandated by statute, citing, *Aldcroft v.* *Fidelity & Cas. Co.*, 106 R.I. 311, 259 A.2d 408 (1969)).

**7.** *See also, Chambers v. Walker*, 653 P.2d 931, 935 (Okla.1982); Couch, *Couch on Insurance*, § 45:652, Vol. 12A, 2d (Rev. ed.), 1981; *see, e.g., Selected Risks Ins. Co. v. Thompson*, 520 Pa. 130, 552 A.2d 1382, 1388 (1989) (and cases cited therein); *Fryer v. National Union Fire Ins. Co.*, 365 N.W.2d 249, 255 (Minn.1985).